IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Tracy W. Penland, | ) | |
| | ) | C.A. No.  8:21-3000-HMH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Metropolitan Life Insurance | ) | |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |

The matter is before the court for review of the claim administrator's decision to deny

long-term disability ("LTD") benefits to Tracy W. Penland ("Penland") under the Continental

Autumotive, Inc. Long-Term Disability Plan (the "Plan") governed by ERISA.[1]  Penland seeks

LTD benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  (Am. Compl., generally, ECF No. 5);

(Joint Stipulation ("J.S.") ¶ 1, ECF No. 17.)  The parties have filed a joint stipulation and

memoranda in support of judgment pursuant to the court's Specialized Case Management Order

for ERISA benefits cases.  The parties agree that the court may dispose of this matter consistent

with the joint stipulation and memoranda.  (Id. ¶ 8, ECF No. 17.)  For the reasons set forth

below, the court affirms Metropolitan Life Insurance Company's ("MetLife") denial of LTD

benefits.

_____

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-
1461.

## I.  Factual and Procedural History

Penland last worked as a Regional Procurement Specialist for his employer, Continental

Automotive, Inc. ("Continental"), on August 14, 2015, when, according to Penland, he became

"completely and totally disabled."  (J.S. Ex. 1 (AR 2), ECF No. 17-1); (Id. Ex. 1 (AR 4061),

ECF No. 17-9); (Pl.'s Mem. Supp. J. 1, ECF No. 19.)  Continental described the position as

"management for indirect [p]rocurement for [p]lant spend[ing] under $5[,000.00] and support of

[o]perational and [t]actical activities for assigned plants.  Lead[ing] efforts to support plant for

payment-related issues, receiving confirmations, and handling expedites."  (J.S. Ex. 1

(AR 4138-39), ECF No. 17-9.)

The job description listed the following essential functions:

• Leading sourcing efforts and drive required savings targets for plant purchases
of $5K or less across all commodities in the plant. Lead decision process on
which requisitions will be driven for savings, and which can be processed by the
Procurement Center. - 10% of the time

• Develop relationship with internal plant customers. Drive for awareness of key
projects and notify Commodity Managers of upcoming tenders for the plant.
Support any large tenders and lead for Commodity Specialist if required. - 20%
of the time

• Lead efforts for obtaining confirmations on 100% of the order for Indirect
Purchases for defined plants.  Work to resolve any pricing or delivery issues per
Purchasing Policy.  Proactively work to handle Accounts Payable issues and
define corrective actions and expedite orders required by Internal customers.  -
40% of the time

• Performing sourcing decisions and assessing market situations and particular
risks to business processes to avoid/prevent potential difficulties through
appropriate counter-measures. - 5% of the time.

• Defining and implementing innovative negotiation concepts and strategies, and
carrying out cost and contract negotiations leading to an agreement being signed
to guarantee uninterrupted supply at optimum conditions. - 5% of the time.

2

• Initiating and expediting specific cost reduction and supplier quality improvement programs (in conjunction with partner functions, such as Development, Supplier Quality Management, Logistics, etc.) to win and develop the best suppliers and to establish an optimum supply chain.

(Id. Ex. 1 (Ar 4138), ECF No. 17-9.)  Additional functions were listed as:

• Responsible for facilitating support within their host facility as Key user for indirect procurement, including systems and support training and in cases limited escalation expediting. - 10% of the time

• Compiling, preparing, presenting and endorsing information relating to sourcing issues, and making this information available to committees, so that facts and figures are made transparent and network partners are informed in full. 5% of the time

(Id. Ex. 1 (AR 4138), ECF No. 17-9.)  The position also required Penland to be able to travel up to ten percent of the time and the ability to work in a plant environment.  (Id. Ex. 1 (AR 4139), ECF No. 17-9.).

## A.  Relevant Plan Terms

The relevant Plan provisions, as stipulated by the parties, are set forth below.

**Disabled or Disability** means that, due to Sickness or as a direct result of accidental injury:

• You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment unless, in the opinion of a Physician, future or continued treatment would be of no benefit; and

• You are unable to earn:

• during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

• after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.  For purposes of determining whether a Disability is the direct result

3

of an accidental injury, the Disability must have occurred within 90 days of the accidental injury and resulted from such injury independent of other causes.

**Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate, Proof must establish:
- the nature and extent of the loss or condition;
- Our obligation to pay the claim; and
- the claimant's right to receive payment.

Proof must be provided at the claimant's expense.

(J.S. ¶ 6, ECF No. 17) (citing (Id. Ex. 2 (AR 5103, 5106), ECF No 17-10.))  In addition, both

parties cite to the limited disability benefits provision in the Plan:

**DISABILITY INCOME INSURANCE: LIMITED DISABILITY BENEFITS**

**. . .**

**For Disability Due to Mental or Nervous Disorders or Diseases, Neuromuscular, Musculoskeletal or Soft Tissue Disorder, Chronic Fatigue Syndrome and related conditions**

If You are Disabled due to one or more of the following, We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:
- 24 months; or
- The Maximum Benefit Period.

Your Disability benefits will be limited as stated above for:

1. a Mental or Nervous Disorder or Disease except for:
- schizophrenia;
- dementia; or
- organic brain disease;

2. Neuromuscular, musculoskeletal or soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:

- Seropositive Arthritis;
- Spinal Tumors, malignancy, or Vascular Malformations;

- Radiculopathies;
- Myelopathies;
- Traumatic Spinal Cord Necrosis; or
- Myopathies.

3. Chronic fatigue[] syndrome and related conditions.

. . .

**Radiculopathies** means disease of the peripheral nerve roots supported by objective clinical findings or nerve pathology.

(Def.'s Mem. Supp. J. 3, ECF No. 18; Pl. Mem. Supp. J. 2, ECF No. 19) (citing (J.S. Ex. 2 (AR 5124), ECF No. 17-10.))

**B. Claim History**

Penland filed a claim for LTD benefits with MetLife on February 3, 2016. (J.S. Ex. 1 (AR 4023-45), ECF No. 17-9.) In his claim, Penland stated that he was disabled pursuant to the Plan because he had contracted E. Coli on a business trip to Guadalajara, Mexico, which ultimately required him to undergo colon resection surgery wherein he had twelve inches of colon and a small intestinal cyst removed. (Id. Ex. 1 (AR 4003), ECF No. 17-9.) Penland also stated that he was disabled and unable to work due to idiopathic gastroparesis, depression, cervical degenerative disc disease, lumbar degenerative disc disease, degenerative joint disease with osteoarthritis in both hips, irritable bowel syndrome ("IBS"), cervical kyphosis, diverticulitis, restless leg syndrome, sleep apnea, psoriasis, vagus nerve damage, and altered bowel habits. (Id. Ex. 1 (AR 4004-22), ECF No. 17-9.) In addition, Penland underwent left hip replacement surgery on August 20, 2015. (Id. Ex. 1 (AR 2), ECF No. 17-1.) MetLife approved Penland's claim for disability benefits in a letter dated February 18, 2016. (J.S. Ex. 1 (AR 3994-97), ECF No. 17-9.) The letter provided in pertinent part:

Our records reflect that your Disability is due to a Neuromuscular, musculoskeletal or soft tissue disorder, which is a condition that is limited under the Plan . . . . Therefore, the maximum benefit duration due to the limited condition will be reached on February 16, 2018.

To continue to qualify for disability benefits until February 16, 2018, you must continue to satisfy the definition of Disability and all other requirements of the Plan. Benefits may continue after February 16, 2018 if you continue to satisfy the definition of Disability solely due to other non-limited medical condition(s) and other plan requirements

(Id. Ex. 1 (AR 3995), ECF No. 17-9.)  The letter also informed Penland that he would be required to periodically submit medical evidence of his disability to MetLife for review, and that his potential to receive vocational rehabilitation services was being assessed.  (Id. Ex. 1 (AR 3997), ECF No. 17-9.)

On July 20, 2017, Dr. Puja Korabathina ("Dr. Korabathina"), medical director at MetLife, conducted a medical file review and determined that Penland's file supported certain restrictions and limitations from August 17, 2015 through February 17, 2016, and up to the time of the medical review.  (Id. Ex. 1 (AR 1570-71), ECF No. 17-3.)  Dr. Korabathina opined that "[t]here should be no work in any capacity from [August 17, 2015] through [January 26, 2017] for . . . treatment of bilateral hip osteoarthritis with multiple hip surgeries including replacements and revision surgeries." (J.S. Ex. 1 (AR 1571), ECF No. 17-3.)  Dr. Korabathina's file review also stated:

The claimant has multiple comorbid conditions including chronic pain of the joints and abdomen that is managed with long-standing narcotics and difficulty with ambulation as documented on multiple physical exams.

As of 1/27/16, it is reasonable to consider full time sedentary capacity work with the following restrictions and limitations. The claimant can sit/stand as needed for comfort (self-accommodate). Walking should be limited.  There should be no climbing.  Twisting/bending/stooping should be occasional.  Reaching above

> shoulder level should be occasional.  There are no restrictions to reaching at front
> and side at desk level, fine finger and eye hand movements.  Lifting/carrying/
> pushing/pulling should be limited to 10 pounds or less occasionally.

(Id. (AR 1571), ECF No. 17-3.)

On September 11, 2017, Metlife conducted an Employability and Labor Market Analysis

("ELMA") for Penland to determine whether he continued to meet the definition of disabled as

defined by the Plan.  (Id. Ex. 1 (AR 1177-79), ECF No. 17-2.)  The review of Penland's medical

records set forth as follows:

> Mr. Penland is diagnosed with bilateral hip osteoarthritis.  He also has a history of
> bilateral shoulder surgeries and attachments in 2014-2015.  He also has evidence
> of cervical and lumbar degenerative disc disease on imaging; degenerative
> scoliosis to a mild degree in the setting of multiple level degenerative disc disease;
> diabetes type II; steatohepatitis with chronically elevated liver function enzymes;
> peripheral neuropathy of bilateral legs; anxiety/depression; hypertension; chronic
> back pain; chronic abdominal pain; obstructive sleep apnea; bilateral carpal tunnel
> syndrome, left greater than right, without denervation; and obesity.  The claimant
> also has severe IBS/chronic constipation with dyssynergia which is disabling with
> resultant severe diarrhea, [][urinary] urgency, and abdominal pain.

(Id. Ex. 1 (AR 1177-79), ECF No. 17-2.)  In addition, the ELMA also noted that "Mr. Penland

requires a four wheeled walker/cane due to difficulty in walking.  He has difficulty performing

[activities of daily living] (such as putting on socks)."  (Id. Ex. 1 (AR 1177), ECF No. 17-2.)

Further, the ELMA also acknowledged that Penland's treating physician had opined that

Penland's physical limitations "severely limit[] his ability to do any productive work other than"

sedentary.  (J.S. Ex. 1 (AR 1177), ECF No. 17-2.)

The ELMA identified Order Department Supervisor ($31.24/hr) and Office Manager

($40.14/hr) as alternative occupations within Penland's qualifications, restrictions, and

commensurate wage level.  (Id. Ex. 1 (AR 1179), ECF No. 17-2.)  Therefore, the ELMA

concluded that "[t]he results of the transferable skills and labor market analyses support the vocational conclusion that vocational alternatives do exist in reasonable numbers in the Asheville, NC area."  (Id. Ex. 1 (AR 1179), ECF No. 17-2.)  The ELMA based this finding on a review of "various job sites."  (Id. Ex. 1 (AR 1179), ECF No. 17-2.)

On November 1, 2017, Penland's attorney sent a letter to Metlife stating that Penland "believes that he suffers from other conditions which are not limited to 24 months under the Policy."  (Id. Ex. 1 (AR 1537, 1543, 1553), ECF No. 17-3.)  The administrative record does not reflect what "other conditions" Penland was asserting at that time.  However, a statement submitted July 13, 2021, by Penland from his primary treating medical provider, Kimberly Cox ("Cox"), an advanced practice registered nurse ("APRN") and family nurse practitioner ("FNP"), identified these conditions as "[gastroesophageal reflux disease], gastroparesis, sleep apnea, diabetes mellitus type 2, psoriasis, neuropathy, diverticulitis, fatty liver, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor dysfunction, and migraine headaches."  (J.S. Ex. 1 (AR 74), ECF No. 17-1.)

On January 29, 2018, Penland was awarded Social Security Disability Income benefits by the Social Security Administration ("SSA") due to his "bilateral hip disorder status post bilateral replacement; cervical spine disorder; lumber spine disorder; osteoarthritis; bilateral shoulder disorder; bilateral knee disorder; obesity; and major depressive disorder," with an effective date of August 14, 2015.  (Id. Ex. 1 (AR 1502-10), ECF No.17-3.)  The SSA also concluded that "there are no jobs that exist in significant numbers in the national economy that [Penland] can perform."  (Id. Ex. 1 (AR 1509), ECF No. 17-3.)

On January 30, 2018, MetLife sent Penland a letter stating that it was reviewing his LTD claim for continued eligibility, and that he would reach "the maximum benefit duration due to the limited condition" on February 16, 2018. (Id. Ex. 1 (AR 1519-22), ECF No. 17-3.) On February 13, 2018, Penland filed a second claim for benefits. (Id. Ex. 1 (AR 1184-89), ECF No. 17-2.) His second claim was approved on February 16, 2018. (J.S. Ex. 1 (AR 1181-83), ECF No. 17-2.) The letter approving his claim did not specifically detail the reasons for the approval other than to state that "based on all information in your claim file, we have continued your disability payments."[2] (Id. Ex. 1 (AR 1181), ECF No. 17-2.)

Metlife sent letters to Penland on June 6, 2018 and October 3, 2018, requesting additional medical documentation. (Id. Ex. 1 (AR 1156, 952), ECF No. 17-2.) In December 2018, MetLife submitted Penland's claim file to two independent physician consultants ("IPC") for review. Both physicians provided opinions on Penland's medical conditions and restrictions and limitations, and opined that Penland was not disabled beyond December 11, 2018, and that he was still able to work with restrictions in place. (Id. Ex.1 (AR 379-95; 333-45), ECF No. 17-1.)

In a report dated December 17, 2018, Dr. Joshua Lewis ("Dr. Lewis"), a board-certified internal medicine physician, opined that Penland's medical information did not support physical limitations beyond December 11, 2018, due to IBS and deferred any opinion regarding Penland's comorbid conditions to the appropriate specialist. (Id. Ex. 1 (AR 379-95), ECF No. 17-1.) Further, Dr. Lewis opined that the medical records did not support a finding that Penland suffers

---

[2] A May 13, 2019 letter from MetLife indicates that this claim may have been approved due to irritable bowel syndrome. (J.S. Ex. 1 (AR 701), ECF No. 17-2.) However, the Initial Denial Letter states that Penland's claim was supported based on his conditions of cervical and lumbar degenerative disease, as of December 12, 2018. (Id. Ex. 1 (AR 268), ECF No. 17-1.)

from a condition or combination of conditions from an internal medicine perspective of such

severity to warrant the placement of restrictions and/or limitations on his activities as of

December 11, 2018.  (J.S. Ex. 1 (AR 395), ECF No. 17-1.)  Dr. Lewis reviewed his opinions in

light of updated medical records on August 20, 2019, September 30, 2019, April 21, 2020, and

May 8, 2020, and concluded that the updated records did not change his prior opinion.  (Id. Ex. 1

(AR 388, 390, 392, 394), ECF No. 17-1.)

In a report dated December 18, 2018, Dr. Naveed Natanzi ("Dr. Natanzi"), a board-

certified physician in physical medicine and rehabilitation, concluded that "[r]adiculopathy is not

supported by the medical information . . . [and he disagreed] that the medical information

supports total restrictions and limitations[.]"  (Id. Ex. 1 (AR 343), ECF No. 17-1.)  Dr. Natanzi

opined that Penland is capable of sustaining full time work for 8 hours per day during a 40-hour

week with the following restrictions:

> Sitting- frequently up to 1 hour at a time for up to 8 hours per day total.
> Standing- occasionally up to 10 minutes at a time for up to 1 hour per day.
> Walking- occasionally up to 10 minutes at a time for up to 30 minutes per day.
> Lifting/carrying- occasionally up to 20 lbs.
> Pushing/pulling- occasionally up to 20 lbs.
> Climbing stairs- occasionally
> Climbing ladders- never
> Stooping- occasionally
> Kneeling- occasionally
> Crouching- occasionally
> Crawling- occasionally
> Reaching- overhead and below desk-occasionally.  At desk level-frequently.
> [B]ending- occasionally
> Use lower extremities for foot controls- frequently
> Fine manipulation- constantly
> Simple and firm grasping- constantly

(Id. Ex. 1 (AR 338), ECF No. 17-1.)  Subsequently, on May 27, 2020, Dr. Natanzi reviewed his

findings based on updated medical records provided by Penland, and concluded that the updated

records did not change his opinion.  (Id. Ex. 1 (AR 339), ECF No. 17-1.)

Thereafter, MetLife sent Penland's medical providers a letter stating that his claim was

under review and provided copies of the IPCs' reports for their review and comment.  (J.S. Ex. 1

(AR 738, 812, 848), ECF No. 17-2.)  The administrative record does not contain any response

from Penland's medical providers to the request for comment.

On February 6, 2019, MetLife conducted a LTD Transferable Skills Analysis ("TSA").

(Id. Ex. 1 (AR 725-28), ECF No. 17-2.)  The TSA

> was performed  utilizing the computerized OASYS Job Match System.  This
> program accounts for worker traits, values, skill levels and specific vocational
> preparation. The transferable skills analysis was performed to determine his
> functional residual capacities.  Research materials utilized include the Dictionary
> of Occupational Titles, (DOT), and TSA software.  The file information included
> a job description, Personal Profile and restrictions and limitations.

> The commensurate wage to be met is $29.87/per hour with the base benefit of
> $4,706.80/per month and pre-disability earnings of $6,275.73/per month.

(Id. Ex. 1 (AR 725), ECF No. 17-2.)  The results of the TSA were summarized as follows:

> Mr. Penland is a 52-year-old male that went out of work on 8/14/2015.  Mr.
> Penland worked as a Senior Advance Purchasing Agent for Continental
> Automotive Systems, Inc. located near Asheville, North Carolina.  Mr. Penland's
> medical records indicate that he has been diagnosed with osteoarthritis and
> fibromyalgia.  Records indicate that full-time work with the above stated
> restrictions and limitations that fall within a sedentary exertion level are
> supported.

> Mr. Penland was referred for a Transferable Skills Analysis and Labor Market
> Survey by MetLife VRC, Ana Vendrell-Rodriguez.  A TSA was conducted on
> 2/6/2019 utilizing the OASYS Data System and information provided by the
> referral source.  Based on Mr. Penland's qualifications and physical capabilities
> the OASYS Data System identified the above listed alternative occupational titles
> as potential employment options.  A Labor Market Survey was completed in
> Asheville North Carolina MSA for the identified occupational titles. A review of

Indeed.com in Monster.com job search engines based on the above listed occupations identified a reasonable number of full-time job postings in the Asheville North Carolina MSA. A review of Career InfoNet business listing and Indeed.com identified a reasonable number of employers that are likely to hire for these occupations. Wage data when identified in job postings did not meet Mr. Penland's commensurate wage of $29.87/per hour.

The results of the research conducted support that Mr. Penland does have skills that transfer into alternative occupations. Alternative occupations and employers exist in reasonable numbers in Mr. Penland's MSA[,] but wages[,] when identified[,] do not meet the gainful rate. All though [sic] OES wage data indicates that the Median wage meets Mr. Penland's commensurate of $29.87/per hour it should be noted that the minimum wage in North Carolina is $7.25/per hour. The wage ranges identified in researched and reviewed job postings were in the range of $15.00-$25.00/per hour. This results in a vocational conclusion that Mr. Penland is employable but wages would not likely meet his gainful rate. This opinion has been given with a reasonable degree of certainty based on the information gathered/provided, my educational background, and professional experience as a Vocational Rehabilitation Counselor.

. . .

**3. Are the identified occupations gainful?** No. OES data indicates that the alternative occupational titles identified via the OASYS Data System meet the gainful rate of $29.87/per hour but when job postings were researched and reviewed, identified wages did not meet gainful.

 (Id. Ex. 1 (AR 727-28), ECF No. 17-2) (emphasis in original).

From March 1, 2019 to March 4, 2019, MetLife performed a Labor Market Survey

("LMS") within a 50-mile radius of Penland's residence. (Id. Ex. 1 (AR 709-20), ECF No. 17-2.)

The LMS "was conducted to identify positions that appear to be consistent with [Penland's] skills

and physical capabilities . . . ." (J.S. Ex. 1 (AR 710), ECF No. 17-2.) The LMS was

"[predicated] on the assumption that a worker who has performed the tasks of one or more

occupations has demonstrated certain skills, aptitudes, and interests which are transferable to the

same or similar occupations in the future." (Id. Ex. 1 (AR 709), ECF No. 17-2.) With that

assumption, the LMS identified the positions of Procurement Manager and Office Manager as

occupations that fit Penland's skills and physical capabilities.  (Id. Ex. 1 (AR 710), ECF No.

17-2.)  The LMS summarized its findings as follows:

> Mr. Penland did meet the minimum requirements to qualify for the Procurement
> Manager and related job opportunities.  He did not meet the physical demand
> requirements reported by 5 of the 10 employers.  3 of the 10 employers surveyed
> reported wage information below his gainful wage of $28.87/hour.
>
> Mr. Penland did not meet the minimum requirements to qualify for 5 of the 8
> Office Manager and related job opportunities.  He did not meet the physical
> demand requirements reported by 5 of the 8 surveyed employers.  6 of the 8
> employers reported wage information below his gainful wage.

(Id. Ex. 1 (AR 720), ECF No. 17-2.)

On May 13, 2019, MetLife sent Penland a letter providing an update on the status of his

LTD Claim:

> Our records show that your disability was approved due to irritable bowel
> syndrome.
>
> We have received new information that shows your disability is solely caused by
> fibromyalgia and osteoarthritis.  This condition is limited under the Plan. . . .
> Therefore, your benefits payable for this condition will end on December 11,
> 2020.

(Id. Ex. 1 (AR 701), ECF No. 17-2.)

On November 18, 2019, Cox sent a letter to MetLife regarding Penland's current medical

treatment and ability to resume working.  (J.S. Ex. 1 (AR 470), ECF No. 17-1.)  In the letter, Cox

explained that Penland's "past medical treatment is significant for diverticulitis, gastroparesis,

bowel resection, fatty liver, NIDDM (x2 years)[type 2 diabetes], pelvic floor dysfunction, [ ],

depression/anxiety, degenerative disc disease with multiple disc bulges, [p]eripheral neuropathy,

restless leg syndrome, [m]igraines, obstructive sleep apnea, [psoriasis], and HTN

[hypertension]."  (Id. Ex. 1 (AR 470), ECF No. 17-1.)  As a result of these conditions, Cox

opined that "[Penland] is not able to work in any capacity . . . ."  (Id. Ex. 1 (AR 470), ECF No. 17-1.)

On January 16, 2020, MetLife provided Penland with another update regarding the status of his LTD benefits claim.  (Id. Ex. 1 (AR 444), ECF No. 17-1.)  In this letter, Metlife stated that it had determined that Penland was "Disabled solely due to osteoarthritis of hip," a condition limited to twenty-four months of LTD benefits per lifetime under the Plan.  (J.S. Ex. 1 (AR 444), ECF No. 17-1.)  The letter also restated MetLife's prior determination that Penland would cease receiving LTD benefits on December 11, 2020.

On October 19, 2020, Penland received a letter from MetLife stating that his benefits would be terminated on December 11, 2020 because "his disability is caused by [a] neuromuscular/soft tissue disorder," and the Plan only permits LTD benefits for twenty-four months for that diagnosis.  (Id. Ex. 1 (AR 319-20), ECF No. 17-1.)  The following month, Penland received a second letter from MetLife stating that his benefits would continue beyond December 11, 2020, while MetLife completed an investigation to determine whether he met the definition of "Disabled."  (Id. Ex. 1 (AR 297-98), ECF No. 17-1.)  On January 11, 2021, MetLife notified Penland that his LTD benefits were being terminated.  (Id. Ex. 1 (AR 264), ECF No. 17-1.)  The Initial Denial Letter provided that the investigation was complete and that MetLife determined that he was no longer entitled to LTD benefits because he had received the maximum twenty-four months of LTD benefits payable under the Plan for a disability caused by neuromuscular and soft tissue disorders.  (Id. Ex. 1 (AR 264-70), ECF No. 17-1.)

The Initial Denial Letter provided that, "[a]s of December 12, 2018, [Penland's] claim was supported based on [Penland's] conditions of cervical and lumbar degenerative disc disease.

14

. . . The maximum duration end date for these conditions was December 11, 2020." (J.S. Ex. 1

(AR 268), ECF No. 17-1.)  Further, the Initial Denial Letter stated that the investigation also

considered Penland's gastrointestinal conditions, but concluded that "the medical information

does not suggest that [Penland] suffer[s] from an internal medical condition or combination of

conditions of such severity to warrant the placement of restrictions and/or limitations on

[Penland's] activities from December 12, 2018 and beyond." (Id. Ex. 1 (AR 268), ECF No.

17-1.)

On March 11, 2021, Penland appealed the initial decision to terminate his benefits.

(Id. Ex. 1 (AR 233-37), ECF No. 17-1.)  On August 3, 2021, MetLife had Penland's claim

reviewed by a third IPC, Dr. Marvin Pietruszka ("Dr. Pietruszka"), a physician board-certified in

occupational medicine.  (Id. Ex. 1 (AR 16-30), ECF No. 17-1.)  Dr. Pietruszka was requested to

review Penland's claim file and advise of any clinical evidence to support any conditions

resulting in restrictions or limitations as of December 12, 2020.  Under "Diagnosis," Dr.

Pietruszka noted that Penland suffered from "gastroparesis, sleep apnea, diabetes, psoriasis,

diverticulitis, fatty liver disease, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor

dysfunction, migraine headaches, neck pain, cervical disc disorder, low back pain, lumbar disc

disorder, bilateral carpal tunnel syndrome, and hypertension."  (Id. Ex. 1 (Ar 16), ECF No. 17-1.)

Dr. Pietruszka opined that the medical information did not support that Penland had any

measurable evidence of radiculopathy on or around December 12, 2020.  (J.S. Ex. 1 AR 16-30),

ECF No. 17-1.)  In his report, Dr. Pietruszka concluded as follows:

> Based on the information provided, the claimant does not have any evidence of
> radiculopathy from the cervical and lumbar spine.  Although the claimant has
> evidence of cord compression at the level of C4/5, there is no evidence of

abnormal cord signal nor any evidence of motor/sensory impairments in bilateral upper extremities. The claimant also has lumbar disc disorder with a significant central canal and neuroforaminal narrowing but no evidence of focal impairments on neurologic exam. The claimant is no longer ambulated with the use of a cane based on last clinic visit. He is very responsive to opioid therapy and provider wishes to continue it. As such, the claimant is not conclusively impaired from a functional standpoint. Therefore, no restrictions and limitations are indicated.

(Id. Ex. 1 (AR 24, 27), ECF No. 17-1.) Dr. Pietruszka also reviewed Penland's remaining medical history, and determined that the medical information did not support a finding of continuous physical functional limitations as of December12, 2020. (Id. Ex. 1 (AR 30), ECF No. 17-1.) Specifically, Dr. Pietruszka opined the following:

[R]egarding gastroparesis, there is no evidence of complications or resultant impairment, such as extreme weight loss.

Regarding obstructive sleep apnea, the medicals do not identify excessive daytime somnolence, cataplexy, morning headache, personality change, or intellectual deterioration.

Regarding diabetes, there is no evidence of functional impairments such as frequent micturition with urgency, delayed wound healing, nephropathy, or retinopathy.

Regarding psoriasis, the claimant had bilateral elbow psoriasis plaques; however, there is no evidence of loss of strength/[range of motion] ROM.

Regarding diverticulitis with chronic abdominal/quad pain from opiate induced constipation, there is no evidence of clinical deficits either, such as loss of strength/ROM.

Regarding fatty liver disease, chronic liver disease serologies have been unremarkable and there is no evidence of episodes of decompensation requiring [Emergency Department] ED visits or hospitalization.

Regarding pharyngoesophageal dysphagia with occasional choking sensation, there is no evidence of functional impairment, as the claimant was encouraged to take small frequent meals, diet, exercise, try ginger supplements, and probiotics.

Regarding ulcerative colitis, there is no evidence of a perforated colon, severe dehydration, or severe bleeding.

Regarding pelvic floor dysfunction, there is no evidence of clinical deficits, such as decreased strength/ROM.
Regarding the claimant's migraine headaches, his hypertension was adequately controlled, and his migraine was improved with Topomax. Furthermore, despite complaints of migraine headaches, there is no documentation of a headache/diary log documenting the severity, duration, and extent of headaches.

Regarding the claimant's diagnosis of hypertension, the claimant has not presented with symptoms of uncontrolled hypertension, hypertensive emergency or urgency like uncontrolled headaches, vision changes, or focal neurologic deficits. Unless end organ damage or functional impairment is evident, no restrictions apply.

Regarding the claimant's dyslipidemia, there is no evidence of end organ damage or evident functional impairment.

Regarding the claimant's [gastroesophageal reflux] GERD, there is no evident functional impairment, as there are no alarm symptoms or complications
. . .

Regarding the claimant's bilateral carpal tunnel syndrome, while the 02/16/2019 EMG [electromyography] and NCV [nerve conduction velocity] findings revealed an abnormal study consistent with bilateral carpal tunnel syndrome, left greater than right, there is no evidence of thenar atrophy, reduced sensation, abnormal strength/ROM.

Regarding the claimant's neuropathy, 02/16/2019 EMG and NCV findings revealed an abnormal study consistent with bilateral carpal tunnel syndrome, left greater than right, without denervation.  No evidence of polyneuropathy or radiculopathy. There is also no evidence of motor/sensory deficits on exam.

(Id. Ex. 1 (AR 29-30), ECF No. 17-1.)  Based on his review of Penland's medical history and

documentation, as well as the IPC reports, Dr. Pietruska opined that Penland's conditions that

are not limited to twenty-four months' of coverage under the Plan ("Non-limited Conditions")

did not support continuous functional limitations from December 20, 2020 and beyond.  (Id. Ex.

1 (AR 28-30), ECF No. 17-1.)

On August 26, 2021, Penland was provided with a copy of Dr. Pietruska's review and was

provided an opportunity to reply with comments.  (J.S. Ex. 1 (AR 33-50), ECF No. 17-1.)

Penland did not provide a response.  On September 14, 2021, after reviewing the record, MetLife

informed Penland of its decision to uphold the denial of his LTD benefits under the Plan.

(Id. Ex. 1 (AR 2-6), ECF No. 17-1.)  The letter explained:

> We acknowledge and considered [Penland's] conditions of [osteoarthritis],
> bilateral [carpal tunnel syndrome], neck pain, cervical disc disorder, low back pain
> and lumbar disc disorder. However, [Penland] has received the Plan's 24-month
> lifetime maximum benefits allowed for these [neuromuscular, musculoskeletal]
> NMS or Soft Tissue Disorders; and we have not identified clinical documentation
> or evidence of Radiculopathy or any conditions considered an exclusion to the
> NMS or Soft Tissue Disorders Limited Disability Benefits Plan provision as of
> December 12, 2020. We also considered [Penland's] conditions of anxiety and
> [major depressive disorder] MDD; however, these are also conditions limited by
> the Plan and [Penland] has received the maximum Limited Benefits under the
> Plan. Therefore, [Penland] is not eligible for further benefits related to a
> Neuromuscular, Musculoskeletal, of Soft Tissue Disorder or Mental or Nervous
> Disorders or Diseases.
>
> We also considered [Penland's] conditions of [gastroesophageal reflux disease],
> gastroparesis, [obstructive sleep apnea], diabetes, psoriasis, neuropathy,
> diverticulitis, fatty liver disease, pharyngoesophageal dysphagia, ulcerative colitis,
> pelvic floor dysfunction, migraine headaches, hypertension, and dyslipidemia. We
> had an IPC Board Certified in Occupational Medicine who reported the clinical
> information on file did not support the presence of functional limitations
> associated with these conditions.  Therefore, we have determined the information
> contained in the claim file does not support [Penland's] inability to perform the
> duties of his job, which is considered any occupation, due to a condition not
> limited by the Plan.

(Id. Ex. 1 (AR 4), ECF No. 17-1.)  Ultimately, Penland received LTD benefits from February 17,

2016 to January 11, 2021. (Id. Ex. 1 (AR 2), ECF No. 17-1.)

### C. Penland's Relevant Medical Information

Penland submits that the following medical information in the administrative record reflects his pertinent medical history "relative to the date [MetLife] terminated his benefits." (Pl.'s Mem. Supp. J. 14-20, ECF No. 19.)  On September 14, 2020, November 16, 2020, and January 6, 2021, Penland received treatment from Dr. Manjakkollai P Veerabagu ("Dr. Veera"). (Id. 14-15, ECF No. 19.)  On September 14, 2020, Dr. Veera's notes reflect that he saw Penland for a "follow up of drug induced constipation and gastroparesis secondary to pain medicine and also due to diabetes." (J.S. Ex. 1 (AR 207), ECF No. 17-1).  Penland's chief complaint was problems related to "diabetic belly."  (Id. Ex. 1 (AR 204), ECF No. 17-1.)  Dr. Veera diagnosed Penland with gastroparesis, drug induced constipation, and epigastric abdominal pain.  (Id. Ex. 1 (AR 211), ECF No. 17-1.)  Under psychiatric, Dr. Veera noted that "[Penland] has a normal mood and affect.  His behavior is normal.  Judgment and thought content normal."  (Id. Ex. 1 (AR 225), ECF No. 17-1.)

On November 16, 2020, Dr. Veera saw Penland for a "follow up of reflux, fatty liver, [] drug induced constipation, [] gastroparesis secondary to pain medicine[,] and also due to diabetes."  (Id. Ex. 1 AR 194), ECF No. 17-1.)  During that visit, he noted:

> Pt has some heartburn, indigestion, and reflux.  Pt has some belching and burping.  Pt has some dysphagia and sensation that food is getting stuck in the chest. Pt has occasional choking sensation. Pt says he is throwing back undigested foods . . . . He says he is not able to eat more [than] a cupful at a time . . . .  Pt has constipation.  Motegrity and Trulance were not effective.  Movantik was not helpful.  These medications cause nausea and no BM.  Pt has also tried Amitiza and Linzess.  Pt has a BM after doing mannual [sic] stimulation, about every 5 days.  Fleet[] enema is not helpful also.  Pt has occasional BRBPR on wiping.  Pt tries to have a BM and sometimes only thing that comes out is Mucous and bowels are very painful.  Pt takes Zofran prn but pt is aware that Zofran can make constipation worse.

> Pt has right sided abd pain, around the hepatic flexure.  Pain has been ongoing for 4 years.  Pt says he was told his gallbladder is fine.  Pain is there with eating.  Pain about 9/10, sharp, dull, aching, and throbbing type pain.  It resolves on its own, esp after passing gas.  Pt has a negative CT in August 2019.  Pt says he is feeling bad and is not able to do anything because of his GI symptoms.  Pt had an EGD/colonoscopy in September 2019 which showed gastritis, diverticulosis, but no polyps, cancer or colitis.

(J.S. Ex. 1 (AR 194), ECF No. 17-1.)  Under psychiatric/behavior, Dr. Veera stated that Penland was "[n]egative for altered mental status, depression, substance abuse, suicidal ideas and thoughts of violence.  The patient is not nervous/anxious." (Id. Ex. 1 (AR 195), ECF No. 17-1.)

On January 6, 2021, Dr. Veera's notes indicate that he saw Penland for a "follow up of reflux, fatty liver, [] drug induced constipation, [] gastroparesis secondary to pain medicine[,] and also due to diabetes." (Id. Ex. 1 (AR 135), ECF No. 17-1.)  Dr. Veera noted that Penland "had upper GI in Sep 2020 which was a normal study.  [He] had an EGD/colonoscopy in September 2019 which showed gastritis, diverticulosis, but no polyps, cancer, or colitis.  [Penland] has had 12 inches of his colon removed in 2014 after an E.coli infection and necrosis." (Id. Ex. 1 (AR 135), ECF No. 17-1.)  Under psychiatric/behavior, Dr. Veera observed that Penland was "[n]egative for altered mental status, depression, substance abuse, suicidal ideas and thoughts of violence.  The patient is not nervous/anxious." (Id. Ex. 1 (AR 136), ECF No. 17-1.)  Finally, Dr. Veera noted that Penland expressed to him that his symptoms were "tolerable at this point." (J.S. Ex. 1 (AR 136), ECF No. 17-1.)  Dr. Veera's notes do not indicate any physical restrictions or functional limitations.

The administrative record reflects that Penland was seen by Dr. Jay Patel ("Dr. Patel") nine times for pain management related to neck pain and low back pain from September 2, 2020 through April 5, 2021. (Id. Ex. 1 (AR 78, 82, 86, 90, 94, 97, 101, 105, 109), ECF No. 17-1.)

Under Historical Assessment/Treatments, Dr. Patel's notes provide:

> CERVICAL
> -H/o chronic neck pain without radicular symptoms since 2014.
> -Imaging: 6/11/2019 MRI cervical spine without contrast, impression:
> 1. Shallow neural arches with mild central stenosis in the upper cervical spine.
> 2. Circumferential disc bulge with some retrolisthesis of C4-C5, an inferior right paracentral extrusion, and buckling of the ligamentum flavum, causes central stenosis and focal cord compression, especially of the right hemicord. No focal cord signal abnormality.
> 3. Minimal degenerative disc disease lower cervical spine with mild central stenosis is seen C6-C7 and some foraminal encroachment at C7-T1.
>
> . . .
>
> LUMBAR
> -H/o chronic low back pain that radiates to hips since 2014.
> -Imaging: 6/11/2019 MRI lumbar spine without contrast, impression:
> 1. Diffuse disc disease with significant central canal, subarticular, and neuroforminal narrowing as detailed above.
> 2. Multilevel lumbar spondylosis with degenerative endplate facet remodeling.

See, e.g., (Id. Ex. 1 (AR 78-79), ECF No. 17-1.) During each visit, Penland reported that his pain level was an 8/10. (Id. Ex. 1 (AR 78, 82, 86, 90, 97, 101, 105, 109), ECF No. 17-1.) Penland also stated that his pain "interferes with sleep, work, housework, [and activities of daily living]." See, e.g., (Id. Ex. 1 (AR 90), ECF No. 17-1.) With the exception of one visit on December 18, 2020, all of these encounters occurred via a telehealth visit. On December 18, 2020, Penland received an "interlaminar epidural steroid injection with fluoroscopic guidance" on the "right [side at the] C7-T1 level." (J.S. Ex. 1 (AR 94), ECF No. 17-1.) Dr. Patel's December 18, 2020 treatment notes reflect a diagnosis of "Radiculopathy, cervical region - M54.12." (Id. Ex. 1 (AR 94), ECF No. 17-1.) In all of the other visits, Dr. Patel's diagnosis is listed as "Cervicalgia - M54.2 (Primary)" and "Radiculopathy, lumbosacral region - M54.17." (Id. Ex. 1 (AR 80, 84, 88, 92, 99, 103, 107, 111), ECF No. 17-1.) In each visit, Dr. Patel noted

that Penland admitted to having depression, but denied having sleep disturbances or anxiety. (Id. Ex. 1 (AR 79, 83, 87, 91, 98, 102, 106, 110), ECF No. 17-1.)  Dr. Patel's notes do not indicate any physical restrictions or functional limitations.

On April 14, 2020, Cox, Penland's primary treating medical provider, completed an Attending Physician Statement on Penland's behalf.  (Id. Ex. 1 (AR 420-23), ECF No. 17-1.) The Attending Physician Statement noted diagnoses of gastroparesis and drug-induced constipation.  (J.S. Ex. 1 (AR 421), ECF No. 17-1.)  Penland's subjective symptoms were listed as "severe constipation, abdominal distention, ulcerative colitis, IBS (Irritable bowel syndrome)." (Id. Ex. 1 (AR 421), ECF No. 17-1.)  She also opined that Penland's return to work progress was "unknown at this time, as medications have not resolved issues."  (Id. Ex. 1 (AR 423), ECF No. 17-1.)

On March 3, 2021, Cox treated Penland and noted "Presents for 6 month follow up. [Past medical history] is significant for diverticulitis, bowel resection, early dumping syndrome, fatty liver, [non-insulin dependent diabetes], pelvic floor dysfunction, gastroparesis, depression/anxiety, [degenerative joint disease] w/multiple disc bulges, Peripheral neuropathy, [restless leg syndrome], Migraines, [obstructive sleep apnea], psorasis (sic), and [hypertension]." She also noted that he appeared with "kyphotic posture.  Walking with assistance of walker, back brace on and intact."  (Id. Ex. 1 (AR 120), ECF No. 17-1.)  Cox also indicated that Penland's migraines were improving, his hypertension was under control, and that he did not have any major concerns.  (Id. Ex. 1 (AR 114), ECF No. 17-1.)  Cox has consistently expressed that, in her professional medical opinion, Penland "is not able to work in any capacity," as indicated in her letters to MetLife on Penland's behalf.  (J.S. Ex. 1 (AR 74-76, 313), ECF No. 17-1.)

**D. Procedural History**

MetLife's denial of Penland's LTD benefits became final when MetLife denied his appeal on September 14, 2021  (Id. Ex. 1 (AR 2-6), ECF No. 17-1.)  Penland filed the instant action on September 17, 2021.  (Compl., ECF No. 1.)  On September 20, 2021 Penland filed an amended complaint.  (Am. Compl., ECF No. 5.)  On March 15, 2022, the parties filed a joint stipulation. (J.S., ECF No. 17.)  The parties filed memoranda in support of judgment on April 19, 2022.  (Pl. Mem. Supp. J., ECF No. 19; Def. Mem. Supp. J., ECF No. 18.)  On April 26, 2022, the parties replied.  (Pl.'s Reply, ECF No. 22; Def.'s Reply, ECF No. 21.)  This matter is now ripe for consideration.

## II.  DISCUSSION OF THE LAW

### A.    Standard of Review

As an initial matter, the parties disagree about the appropriate standard of review that applies in evaluating MetLife's decision to deny LTD benefits.  (J.S. ¶ 3, ECF No. 17.)  "[A] denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

"[N]o specific words or phrases are required to confer discretion, but that [ ] grant of discretionary authority must be clear."  Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 165 (4th Cir. 2013) (citing Gallagher, 305 F.3d at 268).  In addition, any ambiguity in an ERISA plan "is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured."  Id. (citing Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264,

23

269 (4th Cir. 2002).  The critical inquiry is whether the language of the plan in question is

sufficient to convey discretionary authority to its administrator.  See, e.g., Gallagher, at 268-70

(applying de novo review because a clause was susceptible to multiple meanings).

> The Plan provides that
>
> Proof means Written **evidence satisfactory to Us** that a person has satisfied the
> conditions and requirements for any benefit described in this certificate. When a
> claim is made for any benefit described in this certificate, Proof must establish:
> •     the nature and extent of the loss or condition;
> •     Our obligation to pay the claim; and
> •     the claimant's right to receive payment.
> Proof must be provided at the claimant's expense.

(J.S. Ex. 2 (AR 5106), ECF No. 17-10) (emphasis added).  The parties agree that this provision

governs whether or not MetLife is vested with discretionary authority, but disagree about the

import of the "satisfactory to us" language.  (Def.'s Mem. Supp. J. 14-15, ECF No. 18); (Pl.'s

Mem. Supp. J. 23, ECF No. 19.)  MetLife argues that an abuse of discretion standard applies

because the Plan contains discretionary language.  (Def.'s Mem. Supp. J. 14-16, ECF No. 18.)

Penland argues that the language in the Plan is insufficient to confer discretionary authority, and

therefore a de novo standard of review is required .  (Pl.'s Mem. Supp. J. 21-25, ECF No. 19);

(Pl.'s Reply, generally, ECF No. 22.)

In Cosey, the court held that de novo review was appropriate where a plan required

"claimants to submit proof . . . satisfactory to [the plan administrator]."  735 F.3d at 168 (internal

quotations omitted) (alterations in original).  First, the court found "that the phrase 'proof

satisfactory to us' is inherently ambiguous."  Id. at 166.  Second, the court found that this

ambiguous phrase fails to satisfy the notice function of plan language because construing the

phrase as granting discretionary authority "would not be an insured employee's most likely

interpretation of that language." Id. at 168 (internal quotations and citations omitted).  Third, the court concluded that the ambiguous phrase "proof satisfactory to us" "must be construed against the administrator responsible for drafting the plan."  Id.

The provision here contains a nearly identical provision requiring the claimant to submit proof of a disability "satisfactory to [MetLife]."  (J.S. Ex. 2 (AR 5106), ECF No. 17-10.) Accordingly, the court finds that the language in the Plan does not contain language sufficient to vest MetLife with discretionary authority.  Therefore, the court reviews the denial of Penland's claim for LTD benefits de novo.  Under de novo review, "the court review[s] the employee's claim as it would have any other contract claim - by looking to the terms of the plan and other manifestations of the parties' intent."  Firestone Tire & Rubber Co., 489 U.S. at 112-13.  In addition, the de novo standard of review allows the court to examine all of the evidence in the record and decide whether or not the plaintiff in a case is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1025 (4th Cir.1993).

**B.    Entitlement to LTD Benefits**

In conducting a de novo review, the court should only consider the evidence that was before the Policy administrator or trustee at the time of the determination.  See Quisenberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1025 (4th Cir. 1993).  Accordingly, on de novo review, the court's "job is to make [it's] own independent determination of whether" Penland is entitled to LTD benefits."  Shupe v. Hartford Life & Accident Ins. Co., 19 F.4th 697, 706 (4th Cir. 2021).  "The burden is on an insurance beneficiary to prove his or her total disability under a Plan."  Band. v. Paul Revere Life Ins. Co., 14 Fed. App'x 210, 212 (4th Cir. 2001) (per curiam) (unpublished) (citing Fuja v. Benefit Trust Life Ins. Co., 18 F.3d 1405, 1408 (7th Cir.1994)).

The question before the court is whether Penland has provided sufficient proof that he is "disabled" within the meaning of the Plan as of January 11, 2021, the date MetLife discontinued Penland's LTD benefits,[3] and if so, whether the disability falls within the scope of conditions limited to a lifetime benefit of twenty-four months. In reaching this decision the court will consider the administrative record and memoranda submitted by the parties.

The Plan sets forth several requirements that a claimant must satisfy in order to meet the definition of disabled. (J.S. Ex. 2 (AR 5103), ECF No. 17-10.) First, the claimant must suffer from a sickness, which is defined as an "illness, disease, or pregnancy." (Id. Ex. 2 (AR 5106), ECF No. 17-10.) Second, the claimant must be receiving "Appropriate Care and Treatment." (Id. Ex. 2 (AR 5103), ECF No. 17-10.) The Plan defines "Appropriate Care and Treatment" as "medical care and treatment that is given by a Physician . . . [that is] consistent in type, frequency, and duration . . . consistent with a Physician's diagnosis of [the] Disability; and [is] intended to maximize [the claimant's] medical and functional improvement." (Id. Ex. 2 (AR 5103), ECF No. 17-10.) Third, as applied to Penland, he must be unable to earn more than sixty percent of his predisability earnings at any gainful occupation in his local economy. (Id. Ex. 2 (AR 5103), ECF No. 17-10.)

Further, the Plan limits LTD benefits to a lifetime maximum of twenty-four months for "a mental or nervous disorder,"[4] and for "neuromuscular, musculoskeletal or soft tissues

---

[3] DISABILITY INCOME INSURANCE: DATE BENEFIT PAYMENTS END Your Disability benefit payments will end on the earliest of: . . . the date You fail to provide required Proof of continuing Disability. (J.S. Ex. 2 (AR 5122 ), ECF No. 17-10.)

[4] "Mental or Nervous disorder means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual Of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of the cause." (J.S. Ex. 2 (AR 5124), ECF No. 17-10.)

disorder." (J.S. Ex. 2 (AR 5124), ECF No. 17-10.)  Penland has received the maximum LTD

benefit of twenty-four months for his neuromuscular and musculoskeletal conditions that are

subject to the limited disability benefits provision of the Plan.  Thus, in order receive LTD

benefits pursuant to the Plan, Penland must show that he continues to be disabled due to Non-

limited Conditions.  In addition, the Plan provides:

> **DISABILITY INCOME INSURANCE: LONG TERM BENEFITS**
>
> If you become Disabled while insured, Proof of Disability must be sent to Us.
> When We receive such Proof, We will review the claim.  If We approve the claim,
> We will pay the Monthly Benefit up to the Maximum Benefit Period shown in the
> SCHEDULE OF BENEFITS . . . .
>
> To verify that You continue to be Disabled without interruption after Our initial
> approval, We may periodically request that You send Us Proof that You continue
> to be Disabled.  Such Proof may include physical exams, exams by independent
> medical examiners, in-home interviews or functional capacity exams, as needed.

(Id. Ex. 2 (AR 5116), ECF No. 17-10.)

For the reasons set forth below, the court finds that Penland has failed to meet his burden

of showing that his Non-limited medical conditions render him disabled as defined by the Plan.

### 1. Depression and Anxiety

Penland asserts that the MetLife failed to properly consider his depression and anxiety in

evaluating his claims because it did not seek a review of his medical records by a psychiatric

professional.  (Pl.'s Mem. Supp. J. 31-35, ECF No. 19.)  The court notes that Penland does not

cite to any objective evidence in the administrative record to support the contention that he is

disabled due to depression or anxiety.  The only subjective evidence that Penland provides is a

statement and letter from Cox wherein she includes depression and anxiety in his past medical

history.  (J.S. Ex. 1 (AR 74-76, 470), ECF No. 17-1.)  In addition, the administrative record is

devoid of any medical documentation provided by a psychologist or psychiatrist treating Penland stating that he is unable to work due to depression. A review of the administrative record only reflects that Penland has subjectively "admitted" to being depressed as recently as his April 5, 2021 telehealth visit with Dr. Patel. (Id. Ex. 1 (AR 110), ECF No. 17-1.) However, the April 5, 2021 visit was for pain management and does not reflect any diagnosis or treatment for depression. Further, the April 5, 2021 treatment notes states that he denied having anxiety. (Id. Ex. 1 (AR 110), ECF No. 17-1.)

In addition, even if the administrative record supported a finding that Penland was disabled due to depression or anxiety, those conditions are limited to a lifetime LTD benefit of twenty-four months, and Penland has already received the maximum benefit for limited conditions. (Id. Ex. 1 (AR 4), ECF No. 17-10). Accordingly, the court finds that Penland has failed to satisfy his burden of showing that he is entitled to LTD benefits due to depression and/or anxiety.

### 2. Radiculopathy

Penland also argues that his disability due to neuromuscular and musculoskeletal conditions is not limited under the Plan's limited disability benefits for neuromuscular, musculoskeletal, or soft tissue disease because he has been diagnosed with radiculopathy by Dr. Patel. (Pl's Mem. Supp. J. 15-17, ECF No. 19.) Radiculopathy is specifically excepted from the limited disability benefit for neuromuscular, musculoskeletal, or soft tissue diseases. (J.S. Ex. 2 (AR 5124), ECF No. 17-10.) However, Dr. Patel's notes do not include any specific reasoning or explanation for the radiculopathy diagnosis. Further, aside from quoting the findings of the MRI, he does not identify anything in the MRI as supporting his diagnosis of radiculopathy, and did not conduct or order any further tests.

Moreover, there are no other medical records submitted by Penland that include a diagnosis of radiculopathy. Cox does not identify a diagnosis of radiculopathy in her notes or correspondence sent to MetLife on Penland's behalf. See (Id. Ex. 1 (AR 470; 420-23; 313; 114-21), ECF No. 17-1); (Id. Ex. 1 (AR 682), ECF No. 17-2.) Likewise, Dr. Veera does not include a diagnosis of radiculopathy as part of Penland's medical history in his notes. See (Id. Ex. 1 (AR 195; 208; 222-23), ECF No. 17-1.) As discussed above, two of the independent medical consultants who reviewed Penland's medical files concluded that radiculopathy was not supported by the medical information provided. (Id. Ex. 1 (AR 35-49, 333-345), ECF No. 17-1.) Dr. Pietruska found that radiculopathy was not supported by the medical documentation because "there is no evidence of abnormal cord signal nor any evidence of motor/sensory impairments in bilateral upper extremities," or "evidence of focal impairments on neurologic exam." (J.S. Ex. 1 (AR 47), ECF No. 17-1.) Accordingly, the court finds that Penland has failed to submit objective evidence of radiculopathy as required by the Plan. (Id. Ex. 2 (AR 5124), ECF No. 17-10.)

### 3. Remaining Conditions

The court finds that Penland has failed to meet his burden of showing that his remaining, Non-limited Conditions, "[gastroesophageal reflux], gastroparesis, sleep apnea, diabetes mellitus type 2, psoriasis, neuropathy, diverticulitis, fatty liver, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor dysfunction, [] migraine headaches," and hypertension, render him unable to obtain gainful employment. (Id. Ex. 1 (AR 74; 313), ECF No. 17-1.) Of the three medical providers that Penland cited as relative to the date that his LTD benefits were terminated, only Cox has expressed an opinion that he is unable to work. She reached this conclusion after reviewing the Plan's definition of disabled and applying it to Penland's medical history. (Id. Ex. 1 (AR 75-76), ECF No. 17-1.) However, Cox's conclusion did not consider the Plan's

provision limiting LTD benefits for certain medical conditions.

The remaining medical providers do not express any opinion or list any physical restrictions or functional limitations as a result of his remaining conditions as of January 11, 2021. "ERISA does not impose a treating physician rule, under which a plan must credit the conclusions of those who examined or treated a patient over the conclusions of those who did not." White v. Sun Life Assur. Co. of Canada, 488 F.3d 240, 254 (4th Cir. 2007) (citation omitted), abrogated on other grounds, by Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99 (2013); see also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003) (ERISA "do[es] not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical conditions.").

In contrast to Penland's medical providers, the three IPCs provided substantial and comprehensive evaluations for each of the above listed conditions, including detailed explanations for concluding that these conditions did not result in medically necessary restrictions and limitations that prevented Penland from being able to work. Even considering that the three IPCs did not have the opportunity to personally examine Penland, the court finds that their reports are compelling evidence that Penland is not disabled due to any of his Non-limited Conditions especially when contrasted with Cox's evaluation, which is of limited assistance. Likewise, the court also finds Cox's mere listing of Penland's subjective symptoms unpersuasive.

As to Penland's gastroparesis, Dr. Lewis opined that despite some evidence of delayed gastric emptying, "there remains no documentation to support [Penland] [having] episodes of decompensation requiring ED visits or hospitalization, which would result in total loss of function . . . ." (J.S. Ex. 1 (AR 395), ECF No. 17-1.) Dr. Lewis noted that "the 9/26/[20]19

surgical pathology final report . . . revealed an unremarkable antral and gastric body mucosa; no evidence of acute or chronic gastritis."  (Id. Ex. 1 (AR 291), ECF No. 17-1.)  Dr. Lewis also observed that Dr. Veera did not place any work restrictions on Penland due to fatty liver disease. (Id. Ex. 1 (AR 286), ECF No. 17-1.)

Regarding ulcerative colitis, Dr. Pietruska found that "there is no evidence of a perforated colon, severe dehydration, or severe bleeding."  (Id. Ex. 1 (AR 30), ECF No. 17-1.)  As to hypertension, Dr. Pietruska opined that "[Penland] has not presented with symptoms of uncontrolled hypertension, hypertensive emergency or urgency like uncontrolled headaches, vision changes, or focal neurologic deficits.  Unless end organ damage or functional impairment is evident, no restrictions apply."  (Id. Ex. 1 (AR 30), ECF No. 17-1.)

Regarding migraines, Dr. Natanzi observed that Penland "did not report [greater than] 15 headache days per month which would indicate severe and impairing migraines."  (Id. Ex. 1 (AR 343), ECF No. 17-1.)  Further, he noted that Penland did not report that his headaches were unresponsive to medication.  (Id. Ex. 1 (AR 343), ECF No. 17-1.)  Based on the medical documentation Penland submitted, he concluded that "the totality of the information does not support medically necessary restrictions and limitations due to migraines."  (J.S. Ex. 1 (AR 343), ECF No. 17-1.)  Dr. Pietruska also noted that Penland's "migraines ha[ve] improved with Topamax."  (Id. Ex. 1 (AR 30), ECF No. 17-1.)

Regarding sleep apnea, Dr. Pietruska opined that "the medicals do not identify excessive daytime somnolence, cataplexy, morning headache, personality change, or intellectual deterioration," therefore, the documentation does not support physical restrictions or limitations. (Id. Ex. 1 (AR 29), ECF No. 17-1.)  Regarding pharyngoesophageal dysphagia, Dr. Pietruska opined that "there is no evidence of functional impairment, as the claimant was encouraged to

take small frequent meals, diet, exercise, try ginger supplements, and probiotics." (Id. Ex. 1 (AR 30), ECF No. 17-1.)

As to pelvic floor dysfunction,. Dr. Lewis stated that "there is no documentation of . . . pelvic floor dysfunction, other than an After Visit Summary from Urology on 7/24/[20]19 that documented a diagnosis of Neurogenic Bladder Dysfunction without Laboratory Analysis, diagnostic imaging, or a treatment plan that would support a functional impairment and work activity restrictions are not medically necessary." (Id. Ex. 1 (AR 283-84), ECF No. 17-1.)

Regarding diabetes, Dr. Pietruska opined that "there is no evidence of functional impairments such as frequent micturition with urgency, delayed wound healing, nephropathy, or retinopathy." (J.S. Ex. 1 (AR 29), ECF No. 17-1.)

Based on the foregoing and under the de novo standard of review, the court finds that Penland has failed to submit evidence sufficient to establish that he is disabled due to his Non-limited Conditions.

### 4. Totality of Conditions

Penland cites to Cothran v. Reliance Std. Life Ins. Co., No. 6:98-3489-HMH, 1999 WL 33987897 (D.S.C. Feb. 9, 1999) (unpublished), for the proposition that while he may not be entitled to LTD benefits solely due to his limited conditions, those conditions can contribute to his overall disability determination. (Pl.'s Mem. Supp. J. 29, ECF No. 19.)

In Cothran, the court found that the claimant was entitled to LTD benefits because the insurance provider wholly failed to consider the claimant's physical disorders. Cothran, 1999 WL 33987897, at *3. Under the terms of the plan in that case, LTD benefits for "mental disorders" were limited to twenty-four months. Id. at *1. However, the claimant had also

submitted evidence that she suffered from "the physical ailment of migraine headaches," which were not limited under the plan.  Id.  The court found that the undefined phrase "mental disorder" was ambiguous, and construing this ambiguity against the drafter, concluded "that the Plan's limitation on 'mental . . . disorder' d[id] not apply to disorders which have [] physical, in addition to mental, symptoms."  Id. at *4.  Therefore, the court concluded that "a disability caused by a combination of physical and mental ailments is not subject to the Plan's mental illness limitation."  Id. at *4.

Here, the Plan limits LTD benefits to a lifetime maximum of twenty-four months for a disability "due to . . . a mental or nervous disorder," and for "neuromuscular, musculoskeletal or soft tissues disorder."  (J.S. Ex. 2 (AR 5124), ECF No. 17-10.)  Penland does not argue that either of those terms are ambiguous.  Further, the limited disability provision in the Plan in this case is specific and defines the relevant terms in detail.  This is distinct from Cothran wherein the plan was devoid of a definition for mental disorder.  The court finds that the definitions for "mental disorder" and "neuromuscular or soft tissues disorder" contained in MetLife's Plan are readily ascertainable and provide claimants with sufficient detail to determine which conditions are covered by these provisions.

Further, MetLife conducted a cumulative review of Penland's entire medical history in its determination of "Disability" under the Plan and determined that Penland no longer met the definition of "Disability" under the Plan because his disability was due to a condition for which benefits are limited in duration under the Plan, and he had already received the maximum LTD benefits for those conditions.  (Id. Ex. 1 (AR 2-6), ECF No. 17-1); (Reply 6, ECF No. 21.) Accordingly, the court finds the reasoning in Cothran distinguishable from the case at bar.

### 5. Predisability Earnings

Penland submits that the results of the 2019 TSA and LMS, "alone and without considering anything else, qualifies Penland for long term disability benefits under the policy," because the studies did not "identif[y] gainful occupations that satisfied the policy requirements." (Pl.'s Mem. Supp. J. 28, ECF No. 19.) However, as MetLife points out, the TSA incorrectly calculated Penland's predisability earnings as $29.87 per hour. (J.S. Ex. 1 (AR 727-28), ECF No. 17-2); (Def's Reply 13, ECF No. 21.) Under the Plan, "Predisability Earnings" means "gross salary or wages [the claimant] [was] earning from the Policyholder as of [the claimant's] last day of Active Work before [the claimant's] Disability began." (Id. Ex. 2 (AR 5105), ECF No. 17-10.) Penland's predisability earnings were $1484.40 per week, or $37.11 per hour. (Id. Ex. 1 (AR 4053), ECF No. 17-9.) Thus, sixty percent of Penland's predisability earnings would be $890.64 per week, or $22.27 per hour.

The TSA found that alternative occupations and employers exist in reasonable numbers with wages ranging between $15.00 and $25.00 per hour. (Id. Ex. 1 (AR 728), (ECF No.17-2.) Accordingly, Penland's reliance on the TSA is misplaced.

### III. CONCLUSION

For the reasons set forth above, the court concludes that the evidence in the record does not support continued LTD benefits beyond January 11, 2021. It is therefore

**ORDERED** that MetLife's decision denying LTD benefits is affirmed.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 22, 2022