IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Tracy W. Penland, | ) | |
| | ) | C.A. No. 8:21-3000-HMH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Metropolitan Life Insurance | ) | |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on remand from the United States Court of Appeals for the Fourth Circuit. On June 22, 2022, the court entered an order affirming Metropolitan Life Insurance Company's ("MetLife") denial of long-term disability ("LTD") benefits to Tracy W. Penland ("Penland") under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. On appeal, the Fourth Circuit vacated the court's judgment and remanded the matter for proceedings consistent with Tekmen v. Reliance Standard Life Insurance Co., 55 F.4th 951 (4th Cir. 2022). Penland v. Metro. Life Ins. Co., No. 22-1720, 2024 WL 1528957, *3 (4th Cir. Apr. 9, 2024) (unpublished). In accordance with the Fourth Circuit's instructions, the court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[1] To the extent that a finding of fact constitutes a conclusion of law, and vice versa, the court adopts it as such.

---

[1] The court decides this matter on the parties' Joint Stipulation, their cross-memoranda in support of judgment, and the Administrative Record. See Neumann v. Prudential Ins. Co. of Am., 367 F. Supp. 2d 969, 980-94 (E.D. Va. 2005) (resolving a denial-of-benefits case on the administrative record under Rule 52).

# I. FINDINGS OF FACT

## A. The Parties

1.    Penland worked as a Regional Procurement Specialist for Continental Automotive, Inc. ("Continental") when he took disability leave in August 2015.  (J.S. Ex. 1 (A.R. 000002), ECF No. 17-1.)[2]

2.    In that position, Penland was responsible for "[m]anag[ing] . . . [i]ndirect [p]rocurement for [p]lant [s]pend[ing] under $5[,000]," "[s]upport[ing] . . . [o]perational and [t]actical activities for assigned plants," "[l]ead[ing] efforts for plant purchases under $5[,000]," "driv[ing] savings for the plant," and "[l]ead[ing] efforts to support plant for payment[-]related issues, receiving confirmations, and handling expedites."  (Id. Ex. 1 (A.R. 004138), ECF No. 17-9.)  Penland spent 95 percent of his time traveling and attending meetings and the remaining 5 percent working at his desk.  (Id. Ex. 1 (A.R. 000002), ECF No. 17-1.)

3.    As a benefit of his employment with Continental, Penland participated in an LTD benefits plan administered by MetLife.  (Id. Ex. 2 (A.R. 005082-005135), ECF No. 17-10.)

## B. The Plan

4.    Under the terms of the plan, a claimant is "Disabled," if "due to Sickness or as a direct result of accidental injury," the claimant is

> receiving Appropriate Care and Treatment and complying with the requirements of such treatment unless, in the opinion of a Physician, future or continued treatment would be of no benefit; and
>
> [is] unable to earn:
>
>> during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of [the claimant's] Predisability Earnings

---

[2] "J.S." refers to the Joint Stipulation filed by the parties.  "A.R" refers to the Administrative Record.

> at [the claimant's] Own Occupation from any employer in [the] Local Economy; and
>
> after such period, more than 60% of [the claimant's] Predisability Earnings from any employer in [the] Local Economy at any gainful occupation for which [the claimant is] reasonably qualified taking into account [the claimant's] training, education and experience.

(Id. Ex. 2 (A.R. 005103), ECF No. 17-10.)

5.     To receive benefits under the plan, a claimant must send "Proof of Disability" to MetLife. (J.S. Ex. 2 (A.R. 005116), ECF No. 17-10.)  The plan defines "Proof" as "[w]ritten evidence satisfactory to [MetLife] that a person has satisfied the conditions and requirements for . . . benefit[s]." (Id. Ex. 2 (A.R. 005106), ECF No. 17-10.)  Proof "must establish" "the nature and extent of the loss or condition," MetLife's "obligation to pay the claim," and "the claimant's right to receive payment." (Id. Ex. 2 (A.R. 005106), ECF No. 17-10.)  If MetLife approves a claim, it "will pay the Monthly Benefit up to the Maximum Benefit Period shown in the [plan's] SCHEDULE OF BENEFITS, subject to THE DATE BENEFIT PAYMENTS END section." (Id. Ex. 2 (A.R. 005116), ECF No. 17-10.)

6.     The plan also includes a "Limited Disability Benefits" provision, which limits the payment of LTD benefits to a maximum of twenty-four months for "Mental or Nervous Disorder[s]" and "Neuromuscular, musculoskeletal or soft tissue disorder[s]." (Id. Ex. 2 (A.R. 005124), ECF No. 17-10.)  The musculoskeletal disorder limitation does not apply, however, if "the Disability has objective evidence of" one of six listed conditions, including "Radiculopath[y]," which is a "disease of the peripheral nerve roots supported by objective clinical findings or nerve pathology." (J.S. Ex. 2 (A.R. 005124-25), ECF No. 17-10.)

### C. Penland's Initial Claim

7.      Penland filed a claim for LTD benefits with MetLife on February 4, 2016.  (Id. Ex. 1 (A.R. 004002-62), ECF No. 17-9.)  In his application, Penland reported that he had been suffering from debilitating gastrointestinal issues since contracting E. coli in 2014.  (Id. Ex. 1 (A.R. 004003-09), ECF No. 17-9.)  Although Penland underwent colon resection surgery in 2015, the procedure did not alleviate his symptoms, and Penland described in detail how his chronic pain and fatigue impaired his daily living and social functioning.  (Id. Ex. (A.R. 004003-10, 004013-16), ECF No. 17-9.)  He also reported suffering from a number of other health issues, including degenerative joint disease in his right hip, depression, cervical and lumbar degenerative disc disease, psoriasis, cervical kyphosis, sleep apnea, nerve damage in his left leg, and osteoarthritis in his left big toe.  (Id. Ex. 1 (A.R. 004009), ECF No. 17-9.)

8.      MetLife approved Penland's claim for LTD benefits in a letter dated February 18, 2016. (J.S. Ex. 1 (A.R. 003994-97), ECF No. 17-9.)  MetLife wrote:

> Our records reflect that your Disability is due to a Neuromuscular, musculoskeletal or soft tissue disorder, which is a condition that is limited under the Plan . . . . Therefore, the maximum benefit duration due to the limited condition will be reached on February 16, 2018.
>
> To continue to qualify for disability benefits until February 16, 2018, you must continue to satisfy the definition of Disability and all other requirements of the Plan. Benefits may continue after February 16, 2018[,] if you continue to satisfy the definition of Disability solely due to other non-limited medical condition(s) and other plan requirements.

(Id. Ex. 1 (A.R. 003995), ECF No. 17-9.)  The letter also informed Penland that he "must remain Disabled as defined in the Plan" "to continue to receive benefits" and that he would be "required to periodically submit medical evidence of [his] continued disability."  (Id. Ex. 1 (A.R. 003997), ECF No. 17-9.)

4

9.      In July 2017, MetLife's medical director, Dr. Puja Korabathina ("Dr. Korabathina"),

reviewed Penland's medical file.  (Id. Ex. 1 (A.R. 001570-71), ECF No. 17-3.)  Dr. Korabathina

opined that "[t]here should be no work in any capacity from [August 17, 2015,] through [January

26, 2017,] for . . . treatment of bilateral hip osteoarthritis with multiple hip surgeries including

replacements and revision surgeries."  (Id. Ex. 1 (A.R. 001571), ECF No. 17-3.)  She stated that

it was

> reasonable to consider full time sedentary capacity work with the following
> restrictions and limitations.  The claimant can sit/stand as needed for comfort (self-
> accommodate).   Walking should be limited.   There should be no climbing.
> Twisting/bending/stooping should be occasional.  Reaching above shoulder level
> should be occasional.  There are no restrictions to reaching at front and side at desk
> level, fine finger and eye hand movements.   Lifting/carrying/pushing/pulling
> should be limited to 10 pounds or less occasionally.

(J.S. Ex. 1 (A.R. 001571), ECF No. 17-3.)

10.     In September 2017, a vocational rehabilitation consultant completed an "Employability

and Labor Market Analysis."  (Id. Ex. 1 (A.R. 001177-79), ECF No. 17-2.)  The analysis

identified two alternate occupations in the Asheville, NC area that fit "within Mr. Penland's

qualifications, restrictions, and commensurate wage level."  (Id. Ex. 1 (A.R. 001179), ECF No.

17-2.)

11.     In a letter to MetLife dated November 1, 2017, Penland's attorney asserted that Penland

suffered from additional, "other conditions" that were not limited to twenty-four months of

benefits.  (Id. Ex. 1 (A.R. 001553), ECF No. 17-3.)  The letter does not identify the claimed non-

limited conditions.

12.     On January 29, 2018, an administrative law judge ("ALJ") awarded Penland Social

Security Disability Income benefits with an onset date of August 14, 2015.  (Id. Ex. 1 (A.R.

001502-10), ECF No. 17-3.)  In awarding benefits, the ALJ found that Penland suffered from

several "severe impairments," including "bilateral hip disorder[;] status post bilateral [hip] replacement; cervical spine disorder; lumber spine disorder; osteoarthritis; bilateral shoulder disorder; bilateral knee disorder; obesity; and major depressive disorder."  (J.S. Ex. 1 (A.R. 001504-08), ECF No. 17-3.)  The ALJ further found that, based on Penland's age, education, work experience, and residual functional capacity, "there are no jobs that exist in significant numbers in the national economy that [Penland] can perform."  (Id. Ex. 1 (A.R. 001509), ECF No. 17-3.)

13.    On January 30, 2018, less than three weeks until Penland's LTD benefits were set to expire, MetLife sent Penland a letter stating that it was reviewing his claim to determine his continued eligibility for benefits.  (Id. Ex. 1 (A.R. 001519), ECF No. 17-3.)

14.    On February 13, 2018, Penland filed a second claim for benefits.  (Id. Ex. 1 (A.R. 001184-98), ECF No. 17-2.)  MetLife approved his second claim in a letter dated February 16, 2018.  (Id. Ex. 1 (A.R. 001181-83), ECF No. 17-2.)  The letter did not give a reason for the approval, other than stating "based on all information in your claim file, we have continued your disability payments."  (J.S. Ex. 1 (A.R. 001181), ECF No. 17-2.)

15.    MetLife requested additional medical documentation from Penland and his providers in June and October 2018.  (Id. Ex. 1 (A.R. 000964, 001156), ECF No. 17-2.)

16.    In December 2018, MetLife referred Penland's claim to two independent physician consultants, Dr. Joshua Lewis ("Dr. Lewis") and Dr. Naveed Natanzi ("Dr. Natanzi"), for evaluation.  (Id. Ex. 1 (A.R. 000379-95, 000333-45), ECF No. 17-1.)

17.    Dr. Lewis, a board-certified internist, opined that Penland was not disabled due to irritable bowel syndrome ("IBS") or any other gastrointestinal condition and stated that the "medical information [did] not support physical functional limitations beyond [December 11,

6

2018]."  (Id. Ex. 1 (A.R. 000386-87), ECF No. 17-1.)  Dr. Lewis supplemented his report four

times after reviewing additional medical records; each time he reaffirmed his earlier opinion.

(Id. Ex. 1 (A.R. 000388-95), ECF No. 17-1.)

18.     Dr. Natanzi, a board-certified physician in physical medicine and rehabilitation,

concluded that Penland was capable of working eight hours per day and forty hours per week

with certain restrictions:

> Sitting – frequently up to 1 hour at a time for up to 8 hours per day total.
> Standing – occasionally up to 10 minutes at a time for up to 1 hour per day.
> Walking – occasionally up to 10 minutes at a time for up to 30 minutes per day.
> Lifting/carrying – occasionally up to 20 lbs.
> Pushing/pulling[ – ]occasionally up to 20 lbs.
> Climbing stairs – occasionally
> Climbing ladders – never
> Stooping – occasionally
> Kneeling – occasionally
> Crouching – occasionally
> Crawling – occasionally
> Reaching – overhead and below desk – occasionally. At desk level – frequently.
> [B]ending – occasionally
> Use lower extremities for foot controls[ – ]frequently
> Fine manipulation – constantly
> Simple and firm grasping – constantly

(J.S. Ex. 1 (A.R. 000338), ECF No. 17-1.)  Dr. Natanzi issued an addendum to his report in May

2020, in which he opined, among other things, that (1) "the totality of the information d[id] not

support medically necessary restrictions and limitations due to migraines," and (2)

"radiculopathy [wa]s not supported by the medical information."  (Id. Ex. 1 (A.R. 000343), ECF

No. 17-1.)  Dr. Natanzi also "disagree[d] that the medical information support[ed] total

restrictions and limitations," recommending partial work restrictions substantially similar to the

ones he recommended in his December 2018 report.  (Id. Ex. 1 (A.R. 000343), ECF No. 17-1.)

19.     In February 2019, MetLife referred Penland's claim file to Genex Services ("Genex") to

perform a "Transferable Skills Analysis" ("TSA").  (Id. Ex. 1 (A.R. 000725), ECF No. 17-2.)

Considering Penland's education, work history, and physical restrictions, the TSA found that "[a]ternative occupations and employers exist in reasonable numbers" in Penland's geographic area.  (Id. Ex. 1 (A.R. 000728), ECF No. 17-2.)  None of the jobs that Genex identified, however, which fell within a salary range of $15 to $25 per hour, would have paid Penland his calculated "gainful wage" of $29.87 per hour.  (J.S. Ex. 1 (A.R. 000728), ECF No. 17-2.)

20.    The next month, Genex conducted a "Labor Market Survey" ("LMS") to determine the availability of alternative occupations within a fifty-mile radius of Penland's residence.  (Id. Ex. 1 (A.R. 000709), ECF No. 17-2.)  The LMS identified three "Procurement Manager" positions that matched Penland's qualifications, required only sedentary exertion, and paid a gainful wage. (Id. Ex. 1 (A.R. 000711, 000712, 000715), ECF No. 17-2.)

21.    In May 2019, MetLife sent Penland a letter updating him on the status of his claim:

> Our records show that your disability was approved due to irritable bowel syndrome.
>
> We have received new information that shows your disability is solely caused by fibromyalgia and osteoarthritis.  This condition is limited under the Plan . . . . Therefore, your benefits payable for this condition will end on December 11, 2020. Benefits may continue if, after this date, you otherwise satisfy the Plan's definition of disability and you continue to satisfy all other plan requirements.
>
> . . . .
>
> You recently reported you are also disabled due to diabetes, kidney issues and neuropathy, which are non[-]limited disabilities.  We are investigating these diagnos[e]s and we will contact you . . . once the investigation is completed.  Based on the outcome of the investigation, your start and end dates for fibromyalgia and osteoarthritis may change.

(Id. Ex. 1 (A.R. 000701), ECF No. 17-2.)

22.    In November 2019, Penland's primary medical provider, Kimberly Cox ("Nurse Cox"), an advanced practice registered nurse and family nurse practitioner, sent MetLife a letter regarding Penland's medical history and his ability to return to work.  (Id. Ex. 1 (A.R. 000470),

ECF No. 17-1.)  Nurse Cox wrote that Penland's "past medical treatment is significant for diverticulitis, gastroparesis, bowel resection, fatty liver, [type 2 diabetes], pelvic floor dysfunction, . . . depression/anxiety, degenerative disc disease with multiple disc bulges, [p]eripheral neuropathy, restless leg syndrome, [m]igraines, obstructive sleep apnea, psor[i]asis, and [hypertension]."  (J.S. Ex. 1 (A.R. 000470), ECF No. 17-1.)  As a result of these conditions, Nurse Cox remarked that "[Penland] is not able to work in any capacity . . . ."  (Id. Ex. 1 (A.R. 000470), ECF No. 17-1.)

23.    In January 2020, MetLife provided Penland with another update about the status of his claim.  (Id. Ex. 1 (A.R. 000444), ECF No. 17-1.)  In this letter, MetLife stated that it had determined that Penland's "Disability caused by E. Coli, diverticulitis and other gastrointestinal conditions ha[d] resolved" and that he was "now Disabled solely due to osteoarthritis of hip," a condition limited to twenty-four months of benefits.  (Id. Ex. 1 (A.R. 000444), ECF No. 17-1.)  MetLife also "acknowledge[d] [Penland's] report of ongoing conditions including gastroparesis, IBS and other gastrointestinal conditions" but noted that the medical information did not "support a severity in [his] condition that would preclude [him] from performing any occupation."  (Id. Ex. 1 (A.R. 000444), ECF No. 17-1.)

24.    In October 2020, MetLife sent Penland a letter reiterating that his benefits would end on December 11, 2020, because "his disability [was] caused by [a] neuromuscular/soft tissue disorder."  (J.S. Ex. 1 (A.R. 000319), ECF No. 17-1.)  The following month, MetLife sent Penland another letter informing him that he would continue to receive benefits until MetLife completed its review.  (Id. Ex. 1 (A.R. 000297-98), ECF No. 17-1.)

25.    In a letter dated January 11, 2021, MetLife notified Penland that his LTD benefits were being terminated because he no longer satisfied the plan's definition of "Disability."  (Id. Ex. 1

(A.R. 000264), ECF No. 17-1.)  After summarizing Penland's medical history and the findings of

Drs. Lewis and Natanzi, MetLife explained:

> As of December 12, 2018, your claim was supported based on your conditions of cervical and lumbar degenerative disc disease.  Under the Plan, these conditions are limited disabilities[,] and they are limited to 24 months of benefit[s] per lifetime. The maximum duration end date for these conditions was December 11, 2020. . . .
>
> While we acknowledge your ongoing gastrointestinal conditions, the [independent physician consultant] opined [that] given . . . both the subjective and clinical information, the medical information does not suggest that you suffer from an internal medical condition or combination of conditions of such severity to warrant . . . restrictions and/or limitations on your activities from December 12, 2018[,] and beyond.  Therefore, we are terminating your LTD benefits effective January 12, 2021, as you no longer satisfy the definition of Disability[.]

(Id. Ex. 1 (A.R. 000268), ECF No. 17-1.)

### D. Penland Appeals

26.    Penland appealed the decision to terminate his benefits in a letter dated March 11, 2021.

(Id. Ex. 1 (A.R. 000233-34), ECF No. 17-1.)  Penland indicated that he would be submitting

additional medical information for MetLife's consideration.  (J.S. Ex. 1 (A.R. 000233), ECF No.

17-1.)

27.    On July 13, 2021, Penland submitted to MetLife a statement of disability from Nurse Cox

and medical records from Dr. Manjakkollai Veerabagu ("Dr. Veera") and Dr. Jay Patel ("Dr.

Patel").  (Id. Ex. 1 (A.R. 000073-000229), ECF No. 17-1.)

28.    From September 2020 to January 2021, Dr. Veera treated Penland for his

gastroesophageal reflux disease ("GERD"), drug-induced constipation, gastroparesis, and fatty

liver disease.  (Id. Ex. 1 (A.R. 000131-000229), ECF No. 17-1.)  During a visit in September

2020, Penland reported that he was taking Norco three times a day and morphine twice a day for

his back pain.  (Id. Ex. 1 (A.R. 000207), ECF No. 17-1.)  Because of his gastrointestinal

symptoms, he was unable "to eat more than a cupful at a time."  (Id. Ex. 1 (A.R. 000207), ECF

No. 17-1.)  Dr. Veera recommended that Penland eat smaller, more frequent meals and prescribed two medications to help with his chronic constipation.  (J.S. Ex. 1 (A.R. 000207), ECF No. 17-1.)

29.    Penland saw Dr. Veera again in November 2020.  Penland reported that he had been experiencing heartburn, indigestion, reflux, belching, difficulty swallowing, bloating, and nausea and stated that the two constipation medications had not helped.  (Id. Ex. 1 (A.R. 000170), ECF No. 17-1.)  Dr. Veera advised Penland that his opioid use was "making [his] constipation and gastroparesis worse."  (Id. Ex. 1 (A.R. 000170), ECF No. 17-1.)  He "encouraged [Penland] to drink more water" and suggested that he try Pepcid for his reflux, ginger supplements for his nausea, and probiotics for his bloating.  (Id. Ex. 1 (A.R. 000169-70), ECF No. 17-1.)

30.    Penland's final visit with Dr. Veera took place in January 2021.  Penland complained of constipation, dysphagia, heartburn, and nausea but denied bloating and abdominal pain.  (Id. Ex. 1 (A.R. 000136), ECF No. 17-1.)  He stated that his dysphagia was "tolerable" and reported that he was now having bowel movements once every two days.  (J.S. Ex. 1 (A.R. 000134-35), ECF No. 17-1.)  Dr. Veera recommended that Penland eat a low-fat, low-fiber diet and avoid spicy foods and caffeine to help manage his symptoms.  (Id. Ex. 1 (A.R. 000148), ECF No. 17-1.) Apart from diet modifications, Dr. Veera's notes do not discuss any physical restrictions or functional limitations.

31.    Penland saw Dr. Patel nine times from September 2020 to April 2021 for pain management of his neck and low back pain.  (Id. Ex. 1 (A.R. 000078-000112), ECF No. 17-1.) During these visits, Penland reported "chronic" and "constant" pain rated at "8/10" in intensity, which worsened when sitting or standing for "long periods," "walking long distances," "bending

forward/backward," and "lifting objects."  (Id. Ex. 1 (A.R. 000078, 000082, 000086, 000090,

000097, 000101, 000105, 000109), ECF No. 17-1.)

32.    Dr. Patel's notes show that Penland underwent an MRI of his cervical and lumbar spine in

June 2019.  (Id. Ex. 1 (A.R. 000078-79), ECF No. 17-1.)  The impression from the cervical MRI

reads:

> 1. Shallow neural arches with mild central stenosis in the upper cervical spine.
>
> 2. Circumferential disc bulge with some retrolisthesis of C4-C5, an inferior right
> paracentral extrusion, and buckling of the ligamentum flavum, causes central
> stenosis and focal cord compression, especially of the right hemicord.  No focal
> cord signal abnormality.
>
> 3. Minimal degenerative disc disease lower cervical spine with mild central stenosis
> is seen C6-C7 and some foraminal encroachment at C7-T1.

(J.S. Ex. 1 (A.R. 000078-79), ECF No. 17-1.)  As for the lumbar MRI, the interpreting physician

remarked that Penland had "[d]iffuse disc disease with significant central canal, subarticular[,]

and neuroforminal narrowing" as well as "[m]ultilevel lumbar spondylosis with degenerative

endplate facet remodeling."  (Id. Ex. 1 (A.R. 000079), ECF No. 17-1.)

33.    Eight of Penland's nine appointments with Dr. Patel were telehealth visits.  (Id. Ex. 1

(A.R. 000078, 000082, 000086, 000090, 000097, 000101, 000105, 000109), ECF No. 17-1.)

During an in-person appointment in December 2020, Penland received an epidural steroid

injection at the C7-T1 level.  (Id. Ex. 1 (A.R. 000094), ECF No. 17-1.)  Dr. Patel's treatment

notes for this visit reflect a diagnosis of "Radiculopathy, cervical region - M54.12."  (Id. Ex. 1

(A.R. 000094), ECF No. 17-1.)  For the eight telehealth visits, however, Dr. Patel listed

Penland's diagnoses as "Cervicalgia - M54.2 (Primary)" and "Radiculopathy, lumbosacral region

- M54.17."  (J.S. Ex. 1 (A.R. 000078, 000082, 000086, 000090, 000097, 000101, 000105,

000109), ECF No. 17-1.)  Finally, like Dr. Veera's notes, Dr. Patel's notes do not discuss any functional limitations associated with Penland's complained-of conditions.

34.    On March 3, 2021, Nurse Cox saw Penland for a six-month follow-up appointment for his hypertension.  (Id. Ex. 1 (A.R. 000114), ECF No. 17-1.)  Nurse Cox observed that Penland presented with a "kyphotic posture," wore a back brace, and used a walker to ambulate.  (Id. Ex. 1 (A.R. 000120), ECF No. 17-1.)  She noted that Penland's migraines were improving, that his hypertension was "adequately controlled," and that he did not have "any major concerns."  (Id. Ex. 1 (A.R. 000114), ECF No. 17-1.)

35.    In her statement of disability, Nurse Cox specified that Penland suffered from twelve conditions: "GERD, gastroparesis, sleep apnea, diabetes mellitus type 2, psoriasis, neuropathy, diverticulitis, fatty liver, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor dysfunction, and migraine headaches."  (Id. Ex. 1 (A.R. 000074), ECF No. 17-1.)  She added that Penland's subjective symptoms included "numbness/tingling/pain in his extremities," "decreased sleep," "fatigue," "chronic pain in his liver area," "decreased energy," "severe constipation," "abdominal distention," "bowel incontinence," "nausea," and "chronic abdominal pain."  (J.S. Ex. 1 (A.R. 000074), ECF No. 17-1.)  Because of his conditions and symptoms, Nurse Cox continued, Penland has difficulty "performing activities of daily living," "maintaining a consistent schedule," and "sleeping at night" and "cannot perform any activity for an extended period of time."  (Id. Ex. 1 (A.R. 000074-75), ECF No. 17-1.)  Nurse Cox concluded by stating that "based upon [her] medical education and experience and . . . specific knowledge of Mr. Penland's problems and treatment history," Penland "is and has been disabled from performing any occupation, consistent with the [plan's] definition of disability[.]"  (Id. Ex. 1 (A.R. 000075), ECF No. 17-1.)

13

### E. MetLife Reviews and Denies Penland's Appeal

36.    After receiving the information submitted in support of Penland's appeal, MetLife

referred Penland's file to a third independent physician consultant, Dr. Marvin Pietruszka ("Dr.

Pietruszka"), a physician board certified in occupational medicine.  (Id. Ex. 1 (A.R. 000003,

000016-31), ECF No. 17-1.)

37.    Dr. Pietruszka issued his report on August 3, 2021.  (Id. Ex. 1 (A.R. 000016-30), ECF

No. 17-1.)  Dr. Pietruszka first addressed whether "the medical information support[ed]

[Penland] having objective evidence of Radiculopathy."  (J.S. Ex. 1 (A.R. 000023), ECF No. 17-

1.)  In his opinion, Penland did "not have any evidence of radiculopathy from the cervical and

lumbar spine."  (Id. Ex. 1 (A.R. 000023), ECF No. 17-1.)  "Although [Penland] has evidence of

cord compression at the level of C4/5," Dr. Pietruszka wrote, "there is no evidence of abnormal

cord signal nor any evidence of motor/sensory impairments in bilateral upper extremities."  (Id.

Ex. 1 (A.R. 000023), ECF No. 17-1.)  As for Penland's "lumbar disc disorder," Dr. Peitruskza

observed that there was "no evidence of focal impairments on neurologic exam."  (Id. Ex. 1

(A.R. 000023), ECF No. 17-1.)  Dr. Pietruskza also noted that Penland "no longer ambulated

with the use of a cane" and was "very responsive to opioid therapy," meaning that he was "not

conclusively impaired from a functional standpoint."  (Id. Ex. 1 (A.R. 000023), ECF No. 17-1.)

38.    Dr. Peitruskza then explained why functional limitations based on Penland's "other

conditions" were not warranted:

> [R]egarding gastroparesis, there is no evidence of complications or resultant
> impairment, such as extreme weight loss.
>
> Regarding obstructive sleep apnea, the medicals do not identify excessive daytime
> somnolence, cataplexy, morning headache, personality change, or intellectual
> deterioration.

Regarding diabetes, there is no evidence of functional impairments such as frequent micturition with urgency, delayed wound healing, nephropathy, or retinopathy.

Regarding psoriasis, the claimant had bilateral elbow psoriasis plaques; however, there is no evidence of loss of strength/ROM.

Regarding diverticulitis with chronic abdominal/quad pain from opiate[-]induced constipation, there is no evidence of clinical deficits either, such as loss of strength/ROM.

Regarding fatty liver disease, chronic liver disease serologies have been unremarkable and there is no evidence of episodes of decompensation requiring [emergency department] visits or hospitalization.

Regarding pharyngoesophageal dysphagia with occasional choking sensation, there is evidence of functional impairment, as the claimant was encouraged to take small frequent meals, diet, exercise, try ginger supplements, and probiotics.

Regarding ulcerative colitis, there is no evidence of a perforated colon, severe dehydration, or severe bleeding.

Regarding pelvic floor dysfunction, there is no evidence of clinical deficits, such as decreased strength/ROM.

Regarding the claimant's migraine headaches, his hypertension was adequately controlled, and his migraine was improved with Topomax. Furthermore, despite complaints of migraine headaches, there is no documentation of a headache/diary log documenting the severity, duration, and extent of headaches.

Regarding the claimant's diagnosis of hypertension, the claimant has not presented with symptoms of uncontrolled hypertension, hypertensive emergency or urgency like uncontrolled headaches, vision changes, or focal neurologic deficits. Unless end organ damage or functional impairment is evident, no restrictions apply.

Regarding the claimant's dyslipidemia, there is no evidence of end organ damage or evident functional impairment.

Regarding the claimant's GERD, there is no evident functional impairment, as there are no alarm symptoms or complications.

. . . .

Regarding the claimant's bilateral carpal tunnel syndrome, while the 02/16/2019 [electromyography ("EMG")] and [nerve conduction velocity ("NCV")] findings revealed an abnormal study consistent with bilateral carpal tunnel syndrome, left

greater than right, there is no evidence of thenar atrophy, reduced sensation, abnormal strength/ROM.

Regarding the claimant's neuropathy, 02/16/2019 EMG and NCV findings revealed an abnormal study consistent with bilateral carpal tunnel syndrome, left greater than right, without denervation. No evidence of polyneuropathy or radiculopathy. There is also no evidence of motor/sensory deficits on exam.

(J.S. Ex. 1 (A.R. 000029-30), ECF No. 17-1.)

39.    MetLife faxed Penland a copy of Dr. Pietruszka's report on August 26, 2021, and gave him until September 6 to respond. (Id. Ex. 1 (A.R. 000004), ECF No. 17-1.)

40.    After receiving no response from Penland, MetLife upheld its decision to deny Penland's claim on September 14, 2021. (Id. Ex. 1 (A.R. 000002-06), ECF No. 17-1.) It explained to Penland's attorney its decision as follows:

> We acknowledge and considered your client's conditions of [osteoarthritis], bilateral [carpal tunnel syndrome], neck pain, cervical disc disorder, low back pain[,] and lumbar disc disorder. However, he has received the Plan's 24-month lifetime maximum benefits allowed for these [Neuromuscular, Musculoskeletal,] or Soft Tissue Disorders; and we have not identified clinical documentation or evidence of Radiculopathy or any conditions considered an exclusion to the [Neuromuscular, Musculoskeletal,] or Soft Tissue Disorders Limited Disability Benefits Plan provision as of December 12, 2020. We also considered your client's conditions of anxiety and [major depressive disorder]; however[,] these are also conditions limited by the Plan and he has received the maximum Limited Benefits under the Plan. Therefore, your client is not eligible for further benefits related to a Neuromuscular, Musculoskeletal, or Soft Tissue Disorder or Mental or Nervous Disorders or Diseases.

> We also considered your client's conditions of GERD, gastroparesis, [obstructive sleep apnea], diabetes, psoriasis, neuropathy, diverticulitis, fatty liver disease, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor dysfunction, migraine headaches, hypertension, and dyslipidemia. . . . [A]n [independent physician consultant] Board Certified in Occupational Medicine . . . reported the clinical information on file did not support the presence of functional limitations associated with these conditions. Therefore, we have determined the information contained in the claim file does not support your client's inability to perform the duties of his job, which is considered any occupation, due to a condition not limited by the Plan.

(Id. Ex. 1 (A.R. 000004), ECF No. 17-1.)

41.     Altogether, Penland received LTD benefits from February 17, 2016, to January 11, 2021.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

42.     The court has jurisdiction over this action under 28 U.S.C. § 1331 and 29 U.S.C.

§ 1132(e)(1).

43.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2).

### B. Standard of Review

44.     At the outset, the parties disagree about the appropriate standard of review.  MetLife

argues that its decision to terminate Penland's LTD benefits should be reviewed for an abuse of

discretion; Penland contends that de novo review applies.  (J.S. ¶ 3, ECF No. 17.)

45.     The Supreme Court has instructed that "a denial of benefits challenged under [ERISA] is

to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  "If the plan gives

the administrator or fiduciary discretionary authority to make eligibility determinations, the

review is for abuse of discretion." Shupe v. Hartford Life & Accident Ins. Co., 19 F.4th 697, 706

(4th Cir. 2021).

46.     An ERISA plan can confer discretion (1) by language that "expressly creates

discretionary authority" or (2) by terms that "create discretion by implication." Feder v. Paul

Revere Life Ins. Co., 228 F.3d 518, 522-23 (4th Cir. 2000).  Either way, the plan must "manifest

a clear intent to confer such discretion." Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322

(4th Cir. 2008).  In "determining whether a plan sufficiently confers discretion," the court must

construe "[a]ny ambiguity . . . against the drafter of the plan . . . and in accordance with the reasonable expectations of the insured." Id. (internal quotation marks omitted).

47.    With these principles in mind, the court considers whether the plan's language requiring proof of disability "satisfactory to [MetLife]" is sufficient to confer discretionary authority.  (J.S. Ex. 2 (A.R. 005106), ECF No. 17-10.)

48.    In Cosey v. Prudential Insurance Co. of America, 735 F.3d 161 (4th Cir. 2013), the Fourth Circuit joined the First, Second, Third, Seventh, and Ninth Circuits in holding that the phrase "proof satisfactory to [the plan administrator]" does not unambiguously confer discretionary authority. Id. at 166.  Three considerations guided the court's reasoning.  First, it observed that the phrase "proof satisfactory to us" is inherently ambiguous.  Id.  The phrase could, for example, be interpreted as "simply stating the truism that the administrator is the decision-maker who initially must be persuaded that benefits should be paid" or, alternatively, as "describing the inevitable prerogative of a plan administrator to insist that the *form* of proof complies with prescribed standard." Id. (emphasis in original and internal quotation marks omitted).  Next, the court was concerned that such language would not give insured employees "sufficient notice whether their plan administrator has 'broad, unchanneled discretion to deny claims.'" Id. at 167 (quoting Diaz v. Prudential Ins. Co. of Am., 424 F.3d 635, 639-40 (7th Cir. 2005)).  Finally, citing "the well-settled principle that ambiguities . . . must be construed against the administrator responsible for drafting the plan," the Fourth Circuit noted that plan administrators face little difficulty in drafting language that clearly confers discretion.  Id. at 168.

49.    Because the provision at issue here is nearly identical to the one in Cosey, the court finds that the plan does not unambiguously grant MetLife discretion to make benefit determinations.

As a result, the court reviews MetLife's decision to discontinue Penland's LTD benefits de novo. Woods, 528 F.3d at 322.

50.    On de novo review, the court must "make [its] own independent determination of whether [Penland] was entitled to the [LTD] benefits. The correctness, not the reasonableness, of [MetLife's] denial of [LTD] benefits is [the court's] only concern . . . ." Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013). In making its determination, the court "look[s] [only] at the evidence that was before [MetLife] . . . ." Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1025 (4th Cir. 1993).

51.    "The burden of proving the disability is on [Penland] . . . ." Shupe, 19 F.4th at 707 (quoting Elliott v. Sara Lee Corp., 190 F.3d 601, 603 (4th Cir. 1999)).

### C. Whether MetLife's Decision Was Correct

52.    The ultimate issue before the court is whether Penland has provided sufficient proof that he was disabled under the plan as of January 11, 2021, the date MetLife discontinued his LTD benefits.

53.    As mentioned above, the plan considers a claimant disabled if three conditions are met. First, the claimant must be suffering from a "Sickness," which is defined as an "illness" or "disease." (J.S. Ex. 2 (A.R. 005103, 005106), ECF No. 17-10.) Second, the claimant must be "receiving Appropriate Care and Treatment and complying with the requirements of such treatment." (Id. Ex. 2 (A.R. 005103), ECF No. 17-10.) Finally, due to the "Sickness," the claimant must be "unable to earn . . . more than 60% of [the claimant's] Predisability Earnings from any employer in [the] Local Economy at any gainful occupation for which [the claimant is] reasonably qualified . . . ." (Id. Ex. 2 (A.R. 005103), ECF No. 17-10.)

### *1. The court will not consider Penland's limited conditions.*

54.    As an initial matter, the court will not consider Penland's diagnoses of anxiety, depression, carpal tunnel syndrome, osteoarthritis, and degenerative disc and joint disease in determining whether he was disabled as of January 11, 2021.  That is because the plan limits LTD benefits to a lifetime maximum of twenty-four months for any disability that is "due to" a "Mental or Nervous Disorder or Disease" or a "Neuromuscular, musculoskeletal or soft tissue disorder."  (Id. Ex. 2 (A.R. 005124), ECF No. 17-10.)

55.    Resisting this conclusion, Penland argues that the twenty-four-month limitation provision "does not prohibit" the court from considering the cumulative effect of his limited and non-limited conditions as long as his limited conditions were not "the sole cause of his disability." (Pl.'s Mem. Supp. J. 30, ECF No. 19.)  For this argument, he cites the court's decision in Cothran v. Reliance Life Insurance Co., No. CA 6:98-3489-20, 1999 WL 33987897 (D.S.C. Feb. 9, 1999).

56.    In Cothran, the plan similarly limited LTD benefits to twenty-four months for disabilities "due to mental or nervous disorders."  1999 WL 33987897, at *1.  The claimant, who suffered from depression along with physical ailments, argued that the plan administrator improperly denied her benefits based on the "mental disorder" limitation.  Id.  The court agreed.  It found that the term "mental disorder" was ambiguous since the plan did not define the term or "specify whether a mental disorder should be classified by its symptoms or cause."  Id. at 3-4 (internal quotation marks omitted).  The court thus construed the ambiguity against the plan administrator, concluding that "a disability caused by a combination of physical and mental ailments [was] not subject to the [p]lan's mental illness limitation."  Id. at 4.

57.    <u>Cothran</u> does not assist Penland – that case dealt with the meaning of an ambiguous plan

term.  Unlike the claimant in <u>Cothran</u>, Penland does not challenge the meaning of the terms

"Mental or Nervous Disorder or Disease" or "Neuromuscular, musculoskeletal or soft tissue

disorder," which are both defined by the plan.  As a result, there is no need for the court to

construe any ambiguity against MetLife and in favor of Penland.

58.    More fundamentally, Penland's argument is based on a flawed reading of the plan's

"Limited Disability Benefits" provision.  Again, that provision provides that MetLife will limit

benefits to a lifetime maximum of twenty-four months if the claimant is disabled "due to" a

mental, nervous, neuromuscular, musculoskeletal, or soft tissue disorder.  Penland, however,

effectively inserts the adverb "solely" in front of the preposition "due to."  In his view, the "plain

language reading" of the provision is that the twenty-four-month limitation applies only if a

claimant's disability is "*solely caused*" by a limited condition.  (Pl.'s Mem. Supp. J. 29, ECF No.

19) (emphasis added).  The court rejects this construction.

59.    The phrase "due to" means "because of."  <u>See, e.g.</u>, <u>Due to</u>, Merriam-Webster Online

Dictionary, https://www.merriam-webster.com/dictionary/due%20to (last visited July 3, 2024);

<u>Due to</u>, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/due-to (last

visited July 3, 2024); <u>see also</u> <u>Johnson</u>, 716 F.3d at 819-20 ("A paramount principle of contract

law requires us to enforce the terms of an ERISA insurance plan according to the plan's plain

language in its ordinary sense, that is, according to the literal and natural meaning of the Plan's

language." (internal quotation marks and citations omitted)).  "Because of," the Supreme Court

has explained, connotes a but-for causation standard.  <u>Bostock v. Clayton Cty.</u>, 140 S. Ct. 1731,

1739 (2020).  And since "events [can] have multiple but-for causes," <u>id.</u>, Penland's view that his

disability must be "solely caused" by a limited condition for the provision to apply is incorrect.

Cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 241 (1989) ("[T]he words 'because of' do not mean 'solely because of[.]'"), superseded by statute as stated in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1017 (2020).

60.     In short, it is undisputed that Penland has received the maximum twenty-four months of benefits allowed under the plan for his mental and musculoskeletal disorders. The court will not consider these limited conditions in determining whether MetLife wrongfully terminated his LTD benefits.

### 2. Penland has not presented "objective evidence" of radiculopathy.

61.     An exception to the twenty-four-month limit on benefits for a disability caused by a neuromuscular, musculoskeletal, or soft tissue disorder exists if the claimant has "objective evidence" of radiculopathy. (J.S. Ex. 2 (A.R. 005124), ECF No. 17-10.) The plan defines radiculopathy as "disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." (Id. Ex. 2 (A.R. 005124), ECF No. 17-10.)

62.     The term "objective evidence" is not defined by the plan, but as commonly understood, evidence is "objective" if it is "perceptible to persons other than the affected individual." Objective, Merriam-Webster Medical Dictionary, https://c.merriam-webster.com/medlineplus /objective (last visited July 3, 2024). Consistent with this definition, findings from imaging and electrodiagnostic studies, for example, may constitute objective evidence of radiculopathy while a claimant's self-reports of pain and numbness may not. Compare Lesser v. Reliance Std. Life Ins. Co., 385 F. Supp. 3d 1356, 1371 (N.D. Ga. 2019) ("[A] claimant's subjective complaints do not become objective simply because a doctor wrote them down." (internal quotation marks omitted)), and Hennen v. Metro Life Ins. Co., 904 F.3d 532, 542 (7th Cir. 2018) ("Hennen's reported pain, of course, is subjective rather than objective evidence."), and Bunnell v. Sullivan,

947 F.2d 341, 347 (9th Cir. 1991) (characterizing pain as "a completely subjective phenomenon," which "cannot be objectively verified or measured"), with Dolfi v. Disability Reinsurance Mgmt. Servs., 584 F. Supp. 2d 709, 732 n.31 (M.D. Pa. 2008) ("Radiculopathy can be diagnosed through objective evidence such as MRIs, EMGs, and nerve conduction studies."), and Frassrand v. Metro Life Ins. Co., No. 1:07-cv-222, 2009 WL 10709920, at *4 (E.D. Tenn. Mar. 31, 2009) (unpublished) ("[F]indings from an EMG and CT scan may constitute objective evidence of radiculopathy.").

63.     Dr. Patel's treatment notes from September 2020 through April 2021 reflect diagnoses of cervical and lumbar radiculopathy.  (J.S. Ex. 1 (A.R. 000078-000112), ECF No. 17-1.)  But Dr. Patel's diagnoses themselves are not objective evidence – they are "conclusions one might draw from objective evidence."  Sutton v. Metro Life Ins. Co., No. 2:22-cv-00732-KJM-CKD, 2023 WL 4669994, at *7 (E.D. Cal. July 20, 2023) (unpublished).  Moreover, although his notes quote the findings of two physicians who interpreted Penland's June 2019 MRI, Dr. Patel does not offer any reasoning or explanation for why the MRI supported his diagnoses.  The court also observes that neither Dr. Veera's nor Nurse Cox's treatment notes even mention radiculopathy among Penland's many diagnoses.  (J.S. Ex. 1 (A.R. 000114-21, 000131-229, 000681-96), ECF No. 17-1.)  The same is true of Nurse Cox's statement of disability and an attending physician statement she completed in April 2020.  (Id. Ex. 1 (A.R. 000074, 000420-23), ECF No. 17-1.)

64.     In contrast, two independent physician consultants conclusively found no evidence of radiculopathy after reviewing Penland's medical records.  In March 2020, Dr. Natanzi wrote that "[r]adiculopathy is not supported by the medical information."  (Id. Ex. 1 (A.R. 000343), ECF No. 17-1.)  He acknowledged that Penland had "a history of degenerative disc disease and facet arthropathy involving his cervical, thoracic, and lumbar spine" but explained that "imaging

studies did not reveal evidence of dynamic instability[] or spinal cord/nerve root compression, there were no focal neurological deficits or positive dural tension signs noted on examinations, and there were no electrodiagnostic studies demonstrating evidence of radiculopathy."  (Id. Ex. 1 (A.R. 000343), ECF No. 17-1.)  In August 2021, Dr. Pietruszka likewise concluded that Penland "does not have any evidence of radiculopathy from the cervical and lumbar spine," as he did not have an "abnormal cord signal," "motor/sensory impairments in [his] bilateral upper extremities," or "focal impairments on [a] neurological exam."  (Id. Ex. 1 (A.R. 000028), ECF No. 17-1.)  Dr. Pietruszka also cited a February 2019 EMG that revealed "evidence of carpal tunnel syndrome [but] no evidence of radiculopathy."  (Id. Ex. 1 (A.R. 000023, 000030), ECF No. 17-1.)

65.    Based on the above, the court finds that Penland did not have "objective evidence" of radiculopathy on or around January 11, 2021.  He therefore does not qualify for the radiculopathy exception to the plan's twenty-four-month limit on LTD benefits.

### 3. Penland's remaining conditions did not prevent him from earning more than 60 percent of his predisability salary.

66.    Per Nurse Cox's statement of disability, Penland's remaining, non-limited conditions include GERD, gastroparesis, sleep apnea, type 2 diabetes, psoriasis, neuropathy, diverticulitis, fatty liver disease, pharyngoesophageal dysphagia, ulcerative colitis, pelvic floor dysfunction, and migraine headaches.  (J.S. Ex. 1 (A.R. 000074), ECF No. 17-1.)  Based on the court's review, the record does not support a finding that these conditions prevented Penland from earning "more than 60% of [his] Predisability Earnings from any employer in [his] Local Economy at any gainful occupation for which [he was] reasonably qualified" as of January 11, 2021.  (Id. Ex. 2 (A.R. 005103), ECF No. 17-10.)

67.    Under the plan, the term "Predisability Earnings" means "gross salary or wages [the claimant was] earning from the Policyholder as of [the claimant's] last day of Active Work before [the claimant's] Disability began."  (Id. Ex. 1 (A.R. 005105), ECF No. 17-10.)  A workers' compensation form completed in June 2015 reveals that Penland's predisability weekly wage was $1,484.40.  (Id. Ex. 1 (A.R. 004053), ECF No. 17-9.)  Sixty percent of this figure is $890.64, which translates to an hourly wage of $22.27.

68.    According to Penland, the results of the TSA and LMS, "alone and without considering anything else," entitle him to LTD benefits because neither study identified any "gainful occupations that satisfied the policy requirements."  (Pl.'s Mem. Supp. J. 28, ECF No. 19.)  The court disagrees for two reasons.

69.    First, the TSA and LMS did in fact identify gainful occupations in Penland's local economy that he could perform based on his training, education, and experience.  The TSA found that there were a "reasonable number[]" of "[a]lternative occupations and employers" in Penland's area that paid up to $25.00 per hour.  (J.S. Ex. 1 (A.R. 000728), ECF No. 17-1.)  Penland references a statement in the TSA that "wages when identified [did] not meet the gainful rate," (Id. Ex. 1 (A.R. 000728), ECF No. 17-1), but it appears that the TSA incorrectly calculated Penland's gainful wage as $29.87 per hour.  What is more, the LMS identified three positions for which Penland was qualified and physically capable of performing and that met his wage requirement, even using the incorrect, higher hourly wage of $28.87.  (Id. Ex. 1 (A.R. 000710-12, 000715), ECF No. 17-1.)

70.    Second, and perhaps more importantly, the "sedentary work restrictions" on which the TSA and LMS relied were those that Dr. Natanzi had recommended due to Penland's cervical and lumbar degenerative disc disease.  (Id. Ex. 1 (A.R. 000027, 000344-45, 000709, 000725),

ECF No. 17-1.)  As discussed above, though, those conditions are subject to the twenty-four-month limit on benefits for musculoskeletal disorders and thus do not factor into the court's disability analysis.  Apart from Dr. Natanzi's recommendations, the record does not contain evidence of any functional limitations stemming from Penland's non-limited conditions.

71.     Dr. Lewis reviewed Penland's claim five times from December 2018 to December 2019. Each time, he found that the medical information did not support limitations on Penland's ability to work:

- **December 2018**.  Dr. Lewis observed that a gastric emptying study and a breath test from January 2016 were both "normal," meaning that Penland did not have gastroparesis.  He further noted that the results of a September 2017 esophagram and upper gastrointestinal series were "normal" as well and that there was "no further documentation of ongoing care, treatment, or intervention due to IBS."  In addition, he pointed out that there was "no clinical evidence" that Penland had suffered any "episodes of decompensation" due to his fatty liver disease or IBS.

- **August 2019**.  Dr. Lewis wrote that there was "no documentation" that would support "work activity restrictions" due to Penland's diabetes, hypertension, "kidney problems," "bowel and bladder problems," pelvic floor dysfunction, and diabetic neuropathy.  Penland's hypoglycemia was "asymptomatic," and he had been "noncompliant" with maintaining his blood sugar logs.  Lab work from April 2019 showed "normal" renal function and a "normal" complete blood count, which was "inconsistent" with "kidney problems."  Further, a diagnosis of diabetic neuropathy was not warranted, in Dr. Lewis's view, because a physical exam was "unremarkable" and did not show "evidence of sensory loss."  As for Penland's "bladder problems" and pelvic floor dysfunction, Dr. Lewis observed that there was no "[l]aboratory [a]nalysis, diagnostic imaging, or . . . treatment plan" supporting "functional impairment[s]."  In closing, Dr. Lewis highlighted that Penland's type 2 diabetes was "uncomplicated and nearly at goal" and that his hypertension was "well controlled."

- **September 2019**.  Dr. Lewis's "determination" remained "unchanged."  He again concluded that there was "no documentation that would support the presence of gastroparesis" and emphasized that Dr. Veera was "not restricting [Penland's] work activity based on any [gastrointestinal] condition."  Dr. Lewis additionally noted that "work activity restrictions [were] not indicated" due to Penland's fatty liver

disease, "mildly elevated ALT" level,[3] reflux, abdominal pain, or opioid-induced constipation.

- **April 2020**. Dr. Lewis considered Nurse Cox's November 2019 letter to MetLife, her April 2020 attending physician statement, the notes of a nurse practitioner who treated Penland for constipation and gastroparesis, and the results of a November 2019 gastric emptying study, which "revealed borderline delayed gastric emptying." Based on his review of these documents, Dr. Lewis reaffirmed his opinion that the "evidence [did] not suggest that [Penland] suffers from an internal medicine condition or combination of conditions of such severity to warrant the placement of restrictions and/or limitations on his activities."

- **May 2020**. The only new information that Dr. Lewis reviewed this month was a September 2019 pathology report. A biopsy of Penland's stomach showed "an unremarkable antral and gastric body muscosa" and "no evidence of acute or chronic gastritis."

(Id. Ex. 1 (A.R. 000379-95), ECF No. 17-1.)

72.    Like Dr. Lewis, Dr. Pietruszka opined in August 2021 that Penland was capable of working full-time without restrictions or limitations. (J.S. Ex. 1 (A.R. 000048), ECF No. 17-1.) As noted supra at 14-16, Dr. Pietruszka addressed each of Penland's non-limited conditions and explained why none was disabling. (Id. Ex. 1 (A.R. 000029-30), ECF No. 17-1.)

73.    Penland takes issue with Metlife's reliance on Dr. Pietruszka's review. (Pl.'s Mem. Supp. J. 33-35, ECF No. 19) (arguing that MetLife "based its decision on an unreliable medical opinion"). He claims that Dr. Pietruszka "parsed out each one of [his] medical conditions" and failed to consider their cumulative effect on his ability to work. (Id. at 34, ECF No. 19); see Turner v. Ret. & Ben. Plans Comm. Robert Bosch Corp., 585 F. Supp. 2d 692, 703 (D.S.C. 2007) ("[W]hen presented with a disability claim by an insured who suffers from multiple ailments, a plan administrator may not simply evaluate each condition independently to determine whether

---

[3] ALT, or alanine aminotransferase, is "an enzyme . . . which when present in abnormally high levels in the blood is a diagnostic indication of liver disease." Alanine aminotransferase, Merriam-Webster Medical Dictionary, https://c.merriam-webster.com/medlineplus/ alanine%20aminotransferase (last visited July 3, 2024).

any single condition is sufficiently disabling.  Rather, ERISA requires the administrator to evaluate the possibly disabling effect of all medical conditions taken together.").  Dr. Pietruszka, however, specifically stated that Penland did not "suffer[] from a medical condition or *combination of conditions* of such severity to warrant . . . restrictions and limitations on his activities," indicating that he evaluated Penland's conditions as a whole, rather than in isolation. (J.S. Ex. 1 (A.R. 000028), ECF No. 17-1) (emphasis added).

74.    Moreover, because review is de novo, the weight that MetLife gave Dr. Pietruszka's opinion ultimately is irrelevant; the court must make its own "independent determination" of whether the combination of Penland's non-limited conditions rendered him disabled.  Johnson, 716 F.3d at 819; see also Diaz v. Prudential Ins. Co. of Am., 499 F.3d 640, 644 (7th Cir. 2007) ("[I]n [de novo review] cases the district courts are not *reviewing* anything; they are making an independent decision about the employee's entitlement to benefits. . . . What happened before the Plan administrator or ERISA fiduciary is irrelevant.  That means that the question before the district court was not whether [the administrator] gave [the claimant] a full and fair hearing or undertook a selective review of the evidence; rather, it was the ultimate question whether [the claimant] was entitled to the benefits he sought under the plan." (emphasis in original and internal citation omitted)).

75.    The only medical professional who has directly stated that Penland was unable to work is Nurse Cox.  Her two-page statement of disability, however, is largely conclusory and is entitled to little weight when compared to the reports of Drs. Lewis and Pietruszka.  Nurse Cox simply listed Penland's twelve conditions, noted his subjective symptoms, and then stated her conclusion – i.e., that Penland was "disabled from performing any occupation, consistent with the [plan's] definition of disability."  (J.S. Ex. 1 (A.R. 000074-76), ECF No. 17-1.)  Nurse Cox

based her opinion on her "specific knowledge of Mr. Penland's problems and treatment history,"
but unlike Drs. Lewis and Pietruszka, Nurse Cox did not specify what documents she reviewed,
and her statement provides no rationale for why Penland was unable to "perform any activity for
an extended period of time." (Id. Ex. 1 (A.R. 000074-76), ECF No. 17-1.)

76.    Nurse Cox's own treatment notes provide little support for her opinion that Penland was
unable to work. Although she mentioned in her notes Penland's diagnoses of diverticulitis, fatty
liver disease, type 2 diabetes, pelvic floor dysfunction, gastroparesis, neuropathy, migraines,
sleep apnea, and psoriasis, nowhere did she indicate that those conditions warranted functional
limitations, much less any that would render Penland "disabled from performing any
occupation." (Id. Ex. 1 (A.R. 000075, 000114, 000682, 000691), ECF No. 17-1)

77.    Finally, that Drs. Lewis and Pietruszka did not personally examine Penland "does not
invalidate or call into question their conclusions." Anderson v. Cytec Indus., 619 F.3d 505, 515
(5th Cir. 2010). The opinions of treating medical professionals such as Nurse Cox are not
entitled to "special weight" in ERISA cases, Black & Decker Disability Plan v. Nord, 538 U.S.
822, 825 (2003), and reviewing doctors "are fully able to evaluate medical information, balance
the objective data against the subjective opinions of the treating physicians, and render an expert
opinion without direct consultation," Davis v. Unum Life Ins. Co., 444 F.3d 569, 577 (7th Cir.
2006).

78.    In sum, the court has considered the parties' Joint Stipulation, their cross-memoranda in
support of judgment, and the entirety of the 5,000-plus page Administrative Record. After
conducting a de novo review, the court finds that Penland has failed to show by a preponderance
of the evidence that he was unable to earn "more than 60% of [his] Predisability Earnings from
any employer in [his] Local Economy at any gainful occupation for which [he was] reasonably

qualified" due to his non-limited conditions as of January 11, 2021. (J.S. Ex. 2 (A.R. 005103), ECF No. 17-10.) Therefore, because Penland no longer satisfied the plan's definition of disability in January 2021, MetLife did not wrongfully terminate his LTD benefits.

### III. CONCLUSION

For the foregoing reasons, the court finds in favor of MetLife on Penland's claim for benefits under 29 U.S.C. § 1132(a)(1)(B). The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
July 8, 2024